637 P.2d 38 (1981)
97 N.M. 88
KERR-McGEE NUCLEAR CORPORATION, Phillips Uranium Corporation, Sohio Western Mining Company, Todilto Exploration and Development Corporation, United Nuclear Corporation and United Nuclear-Homestake Partners, Appellants,
v.
NEW MEXICO ENVIRONMENTAL IMPROVEMENT BOARD, Appellee.
No. 4653.
Court of Appeals of New Mexico.
April 2, 1981.
Rehearing Denied May 28, 1981.
Certiorari Quashed November 23, 1981.
*39 George W. Terry, Albuquerque, for Phillips Uranium Corp.
Edmund J. Moriarty, Chicago, Ill., for Sohio Western Mining Co.
Mark K. Adams, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for Todilto Exploration & Development Corp.
Peter J. Nickles, John Heintz, Covington & Burling, Washington, D.C., for Kerr-McGee.
G. Stanley Crout, Sunny J. Nixon, C. Mott Wooley, Stephen J. Lauer, Bigbee, Stephenson, Carpenter, Crout & Olmsted, Santa Fe, for Phillips Uranium, Sohio Western Mining Co., Kerr-McGee Nuclear, United Nuclear Corp. and United Nuclear-Homestake.
Jeff Bingaman, Atty. Gen., Bruce S. Garber, Louis W. Rose, John K. Silver, Joseph F. Gmuca, Asst. Attys. Gen., Santa Fe, for appellee; David W. Douglas, Santa Fe, of counsel.

OPINION
SUTIN, Judge.
This appeal involves the validity of the adoption of two amended Radiation Protection Regulations (regulations) by the New Mexico Environmental Improvement Board (EIB) which read:
*40 Section 3-300(L)
Mill applicants shall analyze realistic tailing release scenarios and provide systems to contain potential releases to company controlled property.
Section 3-300(J)
J.1. An application for a radioactive material license for a uranium mill or a commercial radioactive waste disposal site, or for any renewal thereof, or for an amendment thereto as described in 3-300 H(3), shall provide evidence satisfactory to the Director that title to any land, including any interest therein, used for the disposal of the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, or for the disposal of commercial radioactive waste, shall, prior to the deposit of such material on or under that land, be held by the federal government, the State of New Mexico, or the applicant. An appropriate title report or other documents evidencing land ownership, or a properly drawn purchase option, shall be attached to the application.
2. Exemptions from the provisions of this section may be granted by the Director if he determines that holding of title to land, or any interest therein, as otherwise required by this subsection is not necessary or desirable to protect public health and safety or to minimize or eliminate danger to life or property.
3. Prior to the termination of any license for a uranium mill or commercial radioactive waste disposal site, title to the land required to be owned by the United States, the State of New Mexico or the applicant pursuant to this section shall be transferred to either the United States or the State of New Mexico, at the option of the State of New Mexico. Land transferred to the State in accordance with this subsection shall be transferred without cost to the State (other than the administrative and legal costs incurred by the State in carrying out such a transfer).
4. For renewal or amendment of a license which was initially issued prior to the effective date of this subsection, and which does not alter the location of the land used for the disposal of the tailings or wastes, the Director shall take into consideration the status of the ownership of such land and interests therein and the ability of the licensee to transfer title and custody thereof to the United States or the State in reaching the determination of whether to require land ownership or transfer.
5. The provisions of this subsection respecting transfer of title and custody to land shall not apply in the case of lands held in trust by the United States for any Indian tribe or lands owned by an Indian tribe subject to restriction against alienation imposed by the United States. In the case of such lands which are used for the disposal of the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, or commercial radioactive wastes, the applicant shall enter into such arrangements with the Director as may be appropriate to assure the long-term maintenance and monitoring of such lands by the United States or the State of New Mexico.
INTRODUCTION
EIB means the New Mexico Environmental Improvement Board. EIA means the New Mexico Environmental Improvement Agency. EID means the New Mexico Environmental Improvement Division.
At this point, a word of caution must be added. Point A, ante, is involved primarily with Parliamentary Rules of Order. Ordinarily, such boards are not learned in Rules of Order at public hearings where informality is prevalent. Neither are they learned in precise methods after adoption of amending, rejecting, repudiating, suspending, rehearing or reconsidering regulations, nor the precise meaning of those terms nor their application. Misunderstanding can *41 arise but certainty and clarity are essential in the final adoption of regulations for environmental protection. This is a clarion call for punctiliousness because one of the purposes of the Environmental Act is to "protect this generation as well as those yet unborn from health threats posed by the environment." Section 74-1-2, N.M.S.A. 1978. Environmental regulations for "radiation protection" are of vital importance, permanent in nature, massive in number, and generally unintelligible to the lay person.
The Companies ultimately agreed to all except two of some 300 pages of regulations. These two should not be adopted, filed of record, and imposed upon mineral industries if uncertainty exists in the action taken. Common sense dictates that, apart from parliamentary rules of order, a majority of a quorum should take final action on the adoption of the regulations in dispute. In Petition of Kinscherff, 89 N.M. 669, 671, 556 P.2d 355 (Ct.App. 1976) we said:
* * * The acts of a majority of the quorum are binding on the entire body.
EIB is an independent state agency, free of any interposition of EID and EIA. Opposing parties are EID and the Companies. Nevertheless, § 9-7-13, N.M.S.A. 1978 provides that:
The environmental improvement board shall receive staff support from the environmental improvement division of the health and environment department * *.
"Staff support" should not include lawyers from EID. If it does, EIB and the Companies are opposing parties. During the hearing, EIB sought guidance from the lawyers of EID. If EIB favors the lawyers of EID, EIB, EID and EIA constitute a structural administrative agency that can make, adopt, publish and enforce regulations as arbitrarily and capriciously as it desires. This procedure appears to have been undertaken with reference to Section 3-300(L). In Addis v. Santa Fe Cty. Valuation Protests Bd., 91 N.M. 165, 169, 571 P.2d 822 (Ct.App. 1977), this court said:
If the VPB [Valuation Protests Board] is to function as an independent quasi-judicial body, at a minimum it must obtain its legal guidance from someone other than the staff attorneys of the PTD [Property Tax Department]. [Citation omitted.] [Emphasis by court.]
Whenever parliamentary rules are involved in a public hearing EIB should not seek the advice of, nor seek to be represented by attorneys of EID. When this occurred, EIB became an opposing party instead of an independent quasi-judicial body.

A. Section 3-300(L) is not in effect because it was not adopted by a majority vote of a quorum of the EIB after it was placed in a state of suspension.

On November 16, 1979, EIB adopted regulation 3-300(L) with suggested changes of EIA. A petition was filed by the Uranium Environmental Subcommittee and Kerr-McGee Nuclear Corporation (Companies) that EIB reconsider its decision of November 18, 1979 which adopted the recommended amendments of EID as set forth in EID's written submission of September 4, 1979. Two reasons were given:
(1) The Board has not met the statutory requirement of obtaining the "advice and consent" of the Radiation Technical Advisory Council (RTAC).
(2) The Board seemingly has delegated its statutory rule-making authority to the EID * * *. The Board seemingly has based its decision on the EID's suggestions, without considering all of the evidence submitted by the various parties.
On March 14, 1980, the Companies "requested that the Board suspend its action of November 1979 and schedule time on their April agenda when all sides could present oral argument." A motion was made and carried 2-1 "to suspend the Board's November action and at the April 11th meeting to hear oral argument, allowing the Board to take action again at that time." [Emphasis added.] The effect of the motion was to suspend the regulations until action was taken, rather than suspension until a certain date. At this stage, the regulations *42 could not be filed until the suspension was lifted. By a 2-1 vote, EIB rejected a motion to deny the request for reconsideration, thus agreeing to reconsider its decision of November 19, 1979.
At the outset of the April 11th EIB meeting, EID, which had proposed the regulations, specifically requested EIB to adopt those provisions of the proposed amendments which were not in dispute. The EID attorney said:
* * * I am in complete agreement with * * * [EID attorney] that at this point there are two options for the board to do, that is, to readopt those regulations that the board has already adopted once, or, if the board has questions about the language that is used in those regulations that the board has already adopted once, to go back to hearing, and to set the hearing, allow thirty-day's public notice, and proceed as it is required in the law. [Emphasis added.]
Following this, the other EID attorney said:
* * * I think the board has adopted all of the regulations * * *. We  what we are asking now is to list [sic lift] the suspension on those parts of the regulations * *. [Emphasis added.]
After hearing oral argument, EIB took action on other sections of the regulations. The only exception to this pattern involved treatment of Section 3-300(L). After discussion a board member moved that the board "rehear" 3-300(L) "so that all input necessary be allowed." The motion was seconded. Two members of the board voted for the motion and two against. The motion to "rehear" did not pass so that no action was taken. Immediately following the vote, the chairman stated, "[t]herefore, it will be published," and the section ordered to be filed with the State Records Center.
When questioned as to its legality, the EID lawyer stated:
* * * The board adopted by majority this regulation, the board then suspended the regulation's effectiveness pending the hearing * * * today * * *.
Since the board has not decided to go back * * * to continue the suspension, it's my interpretation that a two to two vote means the adoption is valid and it should be filed.
This advice was contrary to EID's position at the opening of the meeting. Yet, the chairman, without comment, let his ruling stand, in effect, adopting the lawyer's interpretation. The regulations were filed under the State Rules Act on or about April 21, 1980.
Regulation 3-300(L) was not readopted, the suspension was not lifted, nor was the regulation returned for hearing. Furthermore no motion was made to file the regulation.
What is meant by "reconsider," "suspend" and "rehear"?
As normally used in the context of administrative adjudication "reconsideration" implies reexamination, and possibly a different decision by the entity which initially decided it. Union Oil Co. of Cal. v. State, Dept. of Nat. Resources, 526 P.2d 1357 (Alaska 1974).
Given its ordinary meaning, the term "suspend" means nothing more than a temporary cessation; i.e., a holding in abeyance. Kansas State Board of Healing Arts v. Seasholtz, 210 Kan. 694, 504 P.2d 576 (1972).
"Although the words `suspension' and `suspend' usually connote something temporary, they have occasionally been used to mean `a permanent stop' or `discontinuance'." Ridenhour v. Mollman Pub. Co., 66 Ill. App.3d 1049, 23 Ill.Dec. 36, 383 N.E.2d 803, 805 (1978).
"A rehearing refers to a reconsideration of a case by the same court in which the original determination was made." Colvin v. Goldenberg, 108 R.I. 198, 273 A.2d 663, 669 (1971).
In the instant case, the Companies petitioned the EIB to reexamine its adoption of regulation 3-300(L) to determine whether it might want to change its position. Upon reconsideration, EIB decided to hold its *43 adoption in abeyance until April 11 in order to allow it "to take action at that time." If no action were taken, the regulation would remain suspended. At the April 11th meeting, EIB was asked again to reconsider the adoption of the regulation. By a 2-2 vote, a majority of the quorum did not vote for or against a "rehearing" or "reconsideration." It took no action. To follow the legal advice given by EID is to declare a regulation of vital importance adopted even though doubt and uncertainty existed.
The mere fact alone that EID took the words "reconsider," "suspend with action to be taken" and "rehear" to mean that "the Board never acted to repeal, rescind or nullify that adoption" is an erroneous conclusion. That was not the issue before the Board. The regulations were in a state of suspension and no action was taken on that issue. The regulation hangs like the Sword of Damocles over the Companies because it is in a state of "suspension." The regulation cannot be filed until EIB, by a majority of a quorum, lifts the suspension. This it has not done. EID argues that the suspension was lifted at the April meeting "since the Board failed to nullify or `unadopt' 3-300(L)." We disagree. The suspension remained in effect until EIB, at a public meeting, lawfully lifted the suspension, amended the regulation or nullified it. Time would not have been wasted if EIB had held a meeting with five members present and voting.
Whenever any doubt arises relevant to the adoption of any "Radiation Protection Regulations," which affect life and health far into the future, doubt must be turned into certainty by a majority vote of a quorum.
We hold that regulation 3-300(L) is not in effect because it was not adopted by a majority vote of a quorum of EIB after it was placed in a state of suspension.

B. Section 3-300(J) is void because the EIB did not obtain the advice and consent of the Radiation Technical Advisory Council.

The Companies claim that Section 3-300(J) is void because EIB did not obtain the advice and consent of the Radiation Technical Advisory Council as provided by law. We agree.
The "Radiation Protection Act" created a "Radiation Technical Advisory Council" (RTAC) consisting of seven members. These persons "shall be individuals with scientific training in one or more of the following fields: diagnostic radiology, radiation therapy, nuclear medicine, radiation or health physics or related sciences with specialization in radiation." Section 74-3-2(B), N.M.S.A. 1978. "It is the duty of the council to advise * * * [EID] and * * * [EIB] on technical matters relating to radiation." Section 74-3-3. Following a public hearing on the adoption of regulations, and after considering the facts and circumstances, EIB shall have the authority, "with the advice and consent of the council * * * to promulgate rules and regulations:
(1) concerning the health and environmental aspects of radioactive material and radiation equipment * * *" Section 74-3-5(A).
Section 3-300(J) falls within this classification.
Following the public hearing held on the adoption of radiation regulations, the Council prepared a document entitled "COMMENTS AND RECOMMENDATIONS OF THE RADIATION TECHNICAL ADVISORY COUNCIL TO THE ENVIRONMENTAL IMPROVEMENT BOARD ON THE RADIATION REGULATIONS PUBLIC HEARING RECORD OF MAY 16-20, 1979." This report was made "[i]n accordance with the Memorandum Agreement * * *." pertinent parts of which were stated in the record. On the fourteenth page of "Comments and Recommendations," the following is stated:
In regard to 3-300 J, after review, the RTAC has determined that this is outside of the scope of the technical expertise and is really a legal question which we would defer to the Board.
The Council made no recommendations with respect to the adoption of 3-300(J). *44 EIB adopted this regulation without the "advice and consent" of the Council.
EID uses several pathways off the legal course to overcome EIB's plain violations of law.
EID claims that § 74-3-3 which sets forth the duty of the Council to advise EIB on "technical matters" is inconsistent with "advice and consent" and creates an ambiguity. We disagree.
Under § 74-3-5(A), EIB is a radiation protection consultant who seeks the advice and opinion of other agencies including the "Radiation Technical Advisory Council." The Council advises EIB on technical matters, but if EIB wants to adopt regulations, it can do so only "with the advice and consent of the council." EIB cannot act lawfully alone.
The reason is obvious. EIB is composed of nonscientifically trained persons whose duties relate to a variety of other enactments. The Council is composed of scientifically trained persons. The legislature made certain that EIB could not adopt regulations simply on the advice of the Council on "technical matters." To "enact" as law, regulations which seriously affect the people of this State and industry, the legislature mandated that EIB "shall promulgate rules and regulations," not only with the advice of the Council, but with its consent. No discretion was allowed EIB. The legislature was wise. It did not allow the Radiation Protection Act "to slip through its fingers like an eel."
EID makes the assertion that RTAC's deferral to the Board on a legal matter outside the scope of its technical expertise constituted "confirmation"; that its deference to the Board constituted approval of whatever good judgment the Board would exercise. To argue that this is lawful "advice and consent of the council" in the promulgation of radiation regulations is feckless reasoning.
To support its position, EID relies on Leek v. Theis, 217 Kan. 784, 539 P.2d 304 (1975); State v. Essling, 268 Minn. 151, 128 N.W.2d 307 (1964); Kligerman v. Lynch, 92 N.J. Super. 373, 223 A.2d 511 (1966); McMahon v. City of Des Moines, 232 Iowa 240, 4 N.W.2d 866 (1942); Larson v. City of St. Paul, 83 Minn. 473, 86 N.W. 459 (1901). What we understand EID's position to be is: when a governor appoints a person to a public office, "The mere act of confirmation or rejection by the Senate, for whatever reason and in whatever manner, is sufficient to meet the requirements of said clause." Kligerman [223 A.2d 513].
Of course, an act of confirmation or rejection does not mean that "deference to the board constituted approval." What it means is that the "council shall approve of it, and take affirmative action * * *." In Re Opinion of The Justices, 190 Mass. 616, 78 N.E. 311, 312 (1906). "As has been pointed out, the legislative intent expressed in the statute is that the office shall be filled by an incumbent selected by the governor and approved by the senate * * *." State v. Watson, 132 Conn. 518, 45 A.2d 716, 724 (1946). See also, Territory of New Mexico v. Stokes and Mullen, 2 N.M. 63 (1881); In the Matter of the Attorney-General, 2 N.M. 49 (1881); Klock v. Mann, 16 N.M. 744, 120 P. 313 (1911).
We are involved "with the advice and consent of the council" prior to the publishing of radiation regulations. It is essential to the orderly conduct of EIB and RATC in this respect that formality be observed in this relationship. These agencies are charged with concurrent duties. Each agency should be able to rely upon the definite and formal notice of the action by the other.
Prior to the public hearing, the regulations were submitted to the Council for "advice and consent." After the public hearing, before EIB could publish the regulations, it needed a formal report from the Council, which it received, not only that it recommended the publication of the regulations, but that it formally approved them. This is what "advice and consent" means in simple ordinary language. This rule or doctrine should not be left in doubt or speculation, or by some interpretation of vague language used, or by deference to the *45 Board. "Advice and consent" must be stated in plain, unequivocal wordage.
The Council did not give its "advice and consent" to EIB prior to the publication of Section 3-300(J).
EID seeks to avoid "advice and consent" by way of a memorandum agreement between EIB and the Council. Pertinent parts were stated in the record as follows:
"Therefore, it is agreed that, one, the R.T.A.C. does not have, and should not have, a veto power over the E.I.D.'s adoption of radiation protection regulations.
"Two, in a promulgation and adoption of radiation protection regulations the following procedures are acceptable to both the E.I.B. and the R.T.A.C.:
"A. The R.T.A.C. will advise and make suggestions to the Environmental Improvement Division staff in the drafting of the proposed radiation protection regulations.
"B. At the public hearing before the Environmental Improvement Board, the R.T.A.C. may participate as individuals or as a body, as would any other participant. R.T.A.C. participation may include submittal of testimony, oral or written, and addressing questions to the witnesses.
"C. After the hearing record is closed and the transcript is prepared and available for public review, the R.T.A.C. and any other participant in the hearing shall have thirty days to submit final comments on the hearing record and propose final wording of the regulations. These comments may not include any evidence.
"D. The E.I.B. shall then consider the record, including final comments and proposed language, and shall take the action the E.I.B. feels is appropriate within the scope of the law."
EID says:
The agreement between RTAC and EIB is an interpretation by the two agencies of the Radiation Protection Act, said interpretation being inter alia an attempt to resolve a patent ambiguity in the statute. The interpretation is not unreasonable, erroneous or legally incorrect. Accordingly, it should be followed by this court * * *.
All that we find in this "agreement" is that RTAC cannot veto EID's adoption of radiation protection regulations; that RTAC will advise and make suggestions to EID's staff in drafting regulations, and after a public hearing, EIB "shall take the actions the EIB feels is appropriate within the scope of the law."
This "agreement" and interpretation of § 74-3-5(A) when exercised is a violation of the law.
Finally, EID claims the Companies are "estopped" from arguing the "advice and consent" issue because the Companies failed to preserve their objection before EIB. EID is mistaken. EIB held its meeting May 16-20, 1979. The Council did not meet until the hearings were over. At its November 1979 meeting EIB adopted the regulations. At this meeting, EIB did not allow further comment by the Companies.
The Companies then filed a petition in which they "respectfully request the Board to reconsider its decision of November 18, 1979 adopting the recommended amendments of * * * [EID] as set forth in the EID's written submission of September 4, 1979. * * *:
1. The Board has not met the statutory requirement of obtaining the `advice and consent' of the Radiation Technical Advisory Council (RTAC)."
EID filed a response. The Board was told of the issue and refused to do anything about it. For the Companies to have done more would have been futile. One is not required to do acts "which are vain or futile." State ex rel. Norvell v. Credit Bur. of Albuquerque, Inc., 85 N.M. 521, 529, 514 P.2d 40 (1973).
In any event, this "procedural device" cannot be used on so important a matter as radiation regulations. Section 74-1-9(G) reads in pertinent part:
Any person who is or may be affected by a regulation adopted by the board may appeal to the court of appeals for further relief * * *.
*46 "For relief" has a broad meaning. It is not limited in scope, i.e., it is not an appeal from a final order or judgment. "For relief" means that when a board adopts a regulation, which, when applied, leads to an unfavorable result to any "person," that "person" can appeal to this Court to challenge the validity of the regulation. This "person" may be an ordinary lay person, one of many at a public hearing, unlearned in the law and procedural process, quiescent in nature, whose thoughts and ideas are not expressed. This lay person stands on an equal footing with corporate "persons" represented by a legal staff. Relief for this lay person is justified in an appeal, notwithstanding the failure to raise legal or factual issues at the public hearing.
We are concerned with radiation regulations of far reaching effects. The legislature made the appellate process broad to allow "any person," lay or corporate, to seek relief, to keep EIB today or tomorrow reasonably aligned with the law. Preserving error at a public hearing is valueless because EIB is not learned in the law or procedural process. It could not legally decide whether a regulation is unconstitutionally vague, nor whether it received the "advice and consent of the council."
EID cannot claim "estoppel" because of the failure of the Companies to preserve error at the public hearing.

C. The Companies did not receive a fair and impartial hearing.

In administrative law it is essential that an independent state agency sit as a fair and impartial body at a hearing in which massive and important regulations are to be adopted. EIB was appointed by the Governor with the advice and consent of the Senate, § 74-1-4, without a staff of its own. EIB had to be responsible for environmental management and consumer protection of this generation as well as those yet unborn. Section 74-1-2. In the performance of its duties, EIB received "staff support" from EID. Section 9-7-13. From this point forward, the inter-relationship of EIB and EID began.
EID was organized within the health and environment department, § 74-1-6, composed only of a "Director." Section 74-1-3(B). The director's staff, which includes lawyers, serves both the director and EIB. The EID staff prepared the regulations for EIB and submitted them to EIB to be presented to all persons at a public hearing. The notice was directed to "all interested persons." At the hearing "all interested persons" were given an opportunity to submit data, views or arguments, orally or in writing, and were allowed to examine witnesses who testified.
The only power granted EID was to "enforce the * * * regulations * * * promulgated by the board * *." [§ 74-1-6], and "maintain, develop and enforce regulations * * *." Section 74-1-7. Its powers arose after the adoption of the regulations, not before. Nevertheless, at the public hearing EID and the Companies were the primary "interested persons." The Director of EID, whose staff prepared the regulations, set himself up as an "interested person," one who could not in any way be affected by the regulations. EID presented to EIB, in support of the regulations it drafted for EIB, all of the data, views and arguments allowed "interested persons," including the examination of witnesses. From the opening of the public hearing to its close, EIB looked to EID for legal guidance, in effect, giving the appearance of a client-attorney relationship with the Companies as adversaries.
EID had no duty or authority by law to prepare the regulations for EIB. We can only assume that EIB impermissibly delegated its authority to the Director of EID to perform its work in preparation of the public hearing. It would have been just as objectionable if EIB had delegated its work to the Companies to prepare the regulations and then come before the Board at a public hearing to defend themselves. The Companies would have prepared favorable regulations in good faith, as did EID, but like EID, it would have shaded the language to mean what the Companies considered to be reasonable requirements to become licensed. EID did not.
*47 EIB should not have recognized EID as an "interested person." EID did not stand on an equal footing with the Companies.
EID and the Companies should stand equally before EIB at a public hearing in one way: that neither of them shall perform any services for EIB, either voluntarily or by request.
Administrative bodies and officers cannot delegate power, authority and functions which under the law may be exercised only by them, which are quasi-judicial in character, or which requires the exercise of judgment. Anderson v. Grand River Dam Authority, 446 P.2d 814 (Okl. 1968); Bunger v. Iowa High School Athletic Association, 197 N.W.2d 555 (Iowa 1972); Voth v. Fisher, 241 Or. 590, 407 P.2d 848 (1965); 2 Am.Jur.2d Administrative Law § 222 at 52 (1962); 73 C.J.S. Public Administrative Bodies and Procedure § 57 (1951).
The proper adoption of radiation regulations falls within this category. EIB had a duty to have the regulations prepared by a staff of its own. It had no right to delegate this authority to one who was an "interested person" at a public hearing.
The promulgation of regulations 3-300(L) and 3-300(J) is declared to be void.
Companies claim regulation 3-300(L) is unconstitutionally vague. We do not deem it necessary to decide this point.
This case is remanded to EIB to take whatever steps are necessary to remove 3-300(L) and 3-300(J) from the Radiation Protection Regulations filed in the State Record Center.
The costs of this appeal shall be paid by the appellee.
IT IS SO ORDERED.
LOPEZ, J., concurs.
WOOD, J. (specially concurs).
WOOD, Judge (specially concurring).

Regulation 3-300(L)
In arguing for the validity of the adoption of this regulation, the EIB asserts the intent of the uranium companies was to suspend this regulation until the April, 1980 meeting. The intent of the uranium companies is not pertinent; the issue is the action taken by the EIB.
The EIB contends that the action taken was to suspend this regulation until the April, 1980 meeting. This is incorrect. The action taken was to suspend, with no termination date stated, to hear oral argument at the April meeting, and to allow the EIB to take action again.
The EIB claims that the motion for reconsideration at the April meeting, which failed by a tie vote, lifted the suspension because this vote was "action taken". I disagree; the tie vote resulted in no action. See Petition of Kinscherff, 89 N.M. 669, 556 P.2d 355 (Ct.App. 1976).
The suspension not having been lifted, this regulation remains suspended, awaiting action by a majority of the EIB. Thus, I agree that this regulation is not in effect.

Regulation 3-300(J)
I agree generally with the discussion that regulation 3-300(J) is not in effect because the RTAC did not consent to the adoption of this regulation. The ways in which consent may be given need not be considered because, as the majority opinion points out, "consent" requires some showing of approval. RTAC's deferral to the EIB was a submission or yielding to the EIB and not approval of the regulation. The agreement between RTAC and EIB had no effect on the consent issue because the agreement was contrary to the statute requiring consent. See Leaco Rural Tel. Coop., Inc. v. Bureau of Revenue, 86 N.M. 629, 526 P.2d 426 (Ct.App. 1974).
I concur in the result reached, but only on the basis stated in this special concurrence  that neither regulation 3-300(L) nor 3-300(J) was properly adopted.