647 P.2d 873

**KERR–McGEE NUCLEAR CORPORATION, Homestake Mining Company, Phillips Uranium Corporation, United Nuclear Corporation, Appellants,**

v.

**NEW MEXICO WATER QUALITY CONTROL COMMISSION, Appellee.**

No. 5232.

Court of Appeals of New Mexico.

Jan. 19, 1982.

Writ of Certiorari Quashed June 23, 1982.

Peter J. Nickles, Charles H. Montange,
Kenneth Carroll, Covington & Burling,

Washington, D. C., and Bruce G. Black, Campbell, Byrd & Black, Santa Fe, for Kerr-McGee Nuclear Corp.

James G. Williams, Susan L. Edwards, Phillips Petroleum Co., Englewood, Colo., for Phillips Uranium Corp.

G. Stanley Crout, Sunny J. Nixon, C. Mott Woolley, Michael S. Yesley, Bigbee, Stephenson, Carpenter, Crout & Olmsted, Santa Fe, for Homestake Mining Co., Phillips Uranium Corp., and United Nuclear Corp.

Jeff Bingaman, Atty. Gen., Bruce S. Garber, Weldon L. Merritt, Allison G. Karslake, Asst. Attys. Gen., Santa Fe, for appellee.

## OPINION

HENDLEY, Judge.

On October 14, 1980, the New Mexico Water Quality Control Commission (Commission) approved the Environmental Improvement Division's (EID) request to hold a public hearing on proposed regulations concerning toxic water pollutants. The public hearings, conducted by a hearing officer pursuant to § 74–6–6, N.M.S.A. 1978 (Repl.1981), were held on January 14 and 15, 1981. The Commission adopted the following regulation setting forth a new definition of toxic pollutants (Water Quality Control Commission Regulation 1–101.X), and amended several other regulations (Regulations 1–101.N, 3–105.A, 3–106, 3–109.C, 3–312.B):

 X. "toxic pollutant" means a water contaminant or combination of water contaminants in concentration(s) which, upon exposure, ingestion, or assimilation either directly from the environment or indirectly by ingestion through food chains, will unreasonably threaten to injure human health, or the health of animals or plants which are commonly hatched, bred, cultivated or protected for use by man for food or economic benefit. As used in this definition injuries to health include death, histiopathologic change, clinical symptoms of disease, behavioral abnormalities, genetic mutation, physiological malfunctions or physical de-

formations in such organisms or their offspring. In order to be considered a toxic pollutant a contaminant must be one of the potential toxic pollutants listed below and be at a concentration shown by scientific information currently available to the public to have potential for causing one or more of the effects listed above. Any water contaminant or combination of the water contaminants in the list below creating a lifetime risk of more than one cancer per 1,000,000 exposed persons is a toxic pollutant.

acrolein
acrylonitrile
aldrin
benzene
* * *

Regulation 1–101.X and the other amended regulations were filed with the State Records Center on June 2, 1981, and with the Supreme Court Law Librarian on June 4, 1981. Kerr-McGee, Homestake, Phillips, and United Nuclear (the Companies) appeal these regulations pursuant to § 74–6–7, N.M.S.A.1978 (Repl.1981), which permits an appeal to this Court by "[a]ny person who is or may be affected by a regulation". The issues on appeal are: 1) whether Regulation 1–101.X is constitutional; 2) whether the second paragraph of Regulation 1–101.X is supported by substantial evidence and is in accordance with law; 3) whether the appellant Companies received a fair and impartial hearing; and 4) whether the Commission unlawfully delegated its authority and functions to the EID.

We hold the regulations are constitutional, the second paragraph of Regulation 1–101.X is supported by substantial evidence, the Companies received a fair hearing, and the Commission did not unlawfully delegate its authority.

*Constitutionality of the Regulations*

Section 74–6–7(C), N.M.S.A.1978 (Repl. 1981), states:

 Upon appeal, the court of appeals shall set aside * * * [a regulation adopted by the commission] only if found to be:

 (1) arbitrary, capricious or an abuse of discretion;

(2) not supported by substantial evidence in the record or reasonably related to the prevention or abatement of water pollution; or

(3) otherwise not in accordance with law.

The Companies contend Regulation 1–101.X defining toxic pollutants and all other regulations making reference to that definition are unconstitutionally vague and, therefore, arbitrary, capricious, an abuse of discretion, and not in accordance with law. The gist of the Companies' argument is that the regulation is so uncertain that they do not have fair notice of what concentration of compounds falls within the definition of toxic pollutants. The Companies state that they will incur penalties for discharging compounds that they, in good faith, believe are not toxic.

The Companies also claim the regulation is an ex post facto law and, therefore, unconstitutional because the determination by the Director of the EID of what is a toxic pollutant will be made after a discharger is already discharging.

Both of the Companies' constitutional arguments are based on a misperception of the regulations and how they are applied. The Companies interpret the regulations as placing the burden on them to determine whether the discharge contains toxic pollutants and, therefore, whether they need a discharge plan. They contend there are many unknowns in this area: such as, whether to extrapolate the data from animal experiments to humans; whether the linear, non-threshold hypothesis should be applied;[1] how sensitive a population to use to determine standards; and, the Companies do not know what standards to use. They assert if they incorrectly determine whether a toxic pollutant is present, they will later be punished. This is an incorrect interpretation of the procedures provided in the regulations. The following is a summary of the applicable procedures.

Any person intending to make a new water contaminant discharge or intending to alter the character or location of an existing one must file a notice with the EID. The notice must contain the name and address of the discharger, the quantity and location of the discharge, and an estimate of the concentration of water contaminants present in the discharge. Regulation 1–201.

Regulation 3–104 is entitled "Discharge Plan Required" and describes those dischargers who must have a plan approved by the Director of the EID (Director). Any person causing or allowing effluent[2] or leachate[3] to be discharged directly or indirectly into ground water must have a discharge plan approved by the Director. The next regulation, 3–105, describes "Exemptions From Discharge Plan Requirement". In thirteen different instances set out in this regulation, no discharge plan will be required. The Companies assume they have the authority to determine that they are exempt under this regulation and that they, therefore, need not apply for a discharge plan every time they come to the conclusion that they are exempt. It is upon this assumption that they base part of their constitutional attack on the regulations. For example, Regulation 3–105.A provides that a discharger is exempt if the discharge is composed of "[e]ffluent or leachate which conforms to all the listed numerical standards of Section 3–103 and has a total nitrogen concentration of 10 mg/1 or less, and does not contain any toxic pollutant." The Companies contend they might, in good faith, determine they are exempt under this section, but the Director might later decide one of the compounds they are discharging is at a concentration that brings it within the definition of toxic pollutant. The Companies would, therefore, be fined for discharging a toxic pollutant.

---

1. This theory states that if adverse effects occur at high concentrations, adverse effects will also occur at lower concentrations, in a linear proportion.

2. Defined as liquid discharged as waste. Webster's Third International Dictionary (1961).

3. Defined as liquid that has percolated through soil or other medium. *Id.*

The flaw in this argument stems from the fact that nowhere in the regulations is the discharger himself given the authority to decide whether he is exempt and to act accordingly. The regulations state that it is the Director who makes that determination. It is the Director who informs the discharger whether he qualifies for an exemption under Regulation 3–105. The language of the regulations supports this conclusion. "To determine conformance [to Regulation 3–103 and the toxic pollutant standards], samples may be taken *by the agency* [EID] before the effluent or leachate is discharged * * *. If for any reason the agency [EID] does not have access to obtain the appropriate samples, this exemption shall not apply." Regulation 3–105.A. (Emphasis added.) "If *the director determines* that a discharger is not exempt from filing a discharge plan pursuant to Section 3–105, or that the material to be discharged contains any toxic pollutant as defined in Section 1–101.X., which is not included in the numerical standards of 3–103, the discharger may appeal such determination * * *." Regulation 3–112.B. (Emphasis added.)

The procedure for applying for approval of a discharge plan under certain circumstances is set out in Regulation 3–106. Anyone who was already discharging before or within 120 days of the effective date of the regulations *will be notified by the Director* if a discharge plan is required. Even if the Director notifies the discharger that he needs to submit a plan, he may discharge up to 240 days without a plan, or longer if the Director allows. Regulation 3–106. If a person plans to begin discharging a contaminant listed in Regulation 3–103 or a toxic pollutant more than 120 days after the effective date of the regulations, he must inform the Director of his name and address, the location and quantity of the discharge, and an estimate of the concentration of water contaminants in the discharge. (This is the same information all dischargers submit to the EID under Regulation 1–201.) The Director must then notify the person if a discharge plan is required. If a plan is required, a proposed plan must be submitted, and it must include the information set out in Regulation 3–106.C. Within 30 days of the submission of a proposed plan, the Director must notify the public, any affected government agencies, and anyone else who has requested notification. Regulation 3–108. During the 30 days following public notice, comments may be made, a public hearing may be requested and shall be held if the Director determines there is significant public interest. Regulation 3–108.

If no public hearing is held, the Director must either approve or disapprove the proposed plan within 60 days after the necessary information was made available to him. Regulation 3–109.A. If a hearing was held, the Director must either approve or disapprove the plan within 60 days of the hearing, or the time the necessary information was made available to him, whichever is later. Regulation 3–109.B. Regulation 3–109.C sets out the criteria the Director must use in determining whether to approve or disapprove a discharge plan. If the Director disapproves a proposed discharge plan or approves a plan subject to condition, the discharger has the right to a hearing de novo by the Commission. Regulation 3–112. The Commission's decisions may be appealed to the Court of Appeals. Regulation 3–113; *see generally,* § 74–6–5, N.M.S.A.1978 (Repl.1981).

■ A statute or regulation is unconstitutional if it defines a prohibited act in terms so vague that men of common intelligence must guess at the meaning and would differ in its application. *Bokum Resources v. N. M. Water Quality Cont.,* 93 N.M. 546, 603 P.2d 285 (1979). We hold this regulation is not unconstitutionally vague under the above definition. The regulations describe the process each discharger must undertake before it discharges. Once the discharger decides when, where, what, and how much it will discharge, it must submit that information to the EID. It must then apply for a discharge plan, no matter what the content of the discharge. If a toxic pollutant is present, the Director will inform the discharger. If the exemption statute applies, the Director will inform the

discharger. The only way the discharger can be fined is if he discharges without a plan in violation of the Director's determination that one is required, or where he discharges in violation of an existing approved plan. This is not vague. Each step is set out in the regulations and each regulation is clearly labeled. Although there are no numerical standards in the regulations for what concentration of compounds triggers the label "toxic pollutant," this is not detrimental to the dischargers. The Director will make those determinations *before* a discharge plan is approved or disapproved, and the discharger will be notified.[4] The lack of numerical standards is, therefore, not a basis for finding the statute unconstitutional.

In *State v. Dority*, 55 N.M. 12, 225 P.2d 1007 (1950), our Supreme Court stated: "Legislative enactments may be declared void for uncertainty if their meaning is so uncertain that the court is unable, by the application of known and accepted rules of construction, to determine what the legislature intended with any reasonable degree of certainty. But absolute or mathematical certainty is not required in the framing of a statute." In deciding whether a regulation is void for vagueness, the same standards are used as for statutes. *See, Bokum, supra*. Since we are able to interpret the regulations in question with reasonable certainty, and for the reasons set out above, we hold the regulations are constitutional.

### Substantial Evidence

The Companies contend that the second paragraph of the definition of toxic pollutant in Regulation 1–101.X is not supported by substantial evidence in the record, as required by § 74–6–7(C), N.M.S.A.1978 (Repl.1981). That part of the definition provides: "Any water contaminant or combination of the water contaminants in the list below creating a lifetime risk of more than one cancer per 1,000,000 exposed persons is a toxic pollutant.

acrolein

acrylonitrile

* * *."

■ We find there was substantial evidence in the record to support the adoption of the above paragraph of Regulation 1–101.X.[5] One of the exhibits offered by the EID at the hearing was a summary of Ambient Water Quality Criteria for the protection of human health published by the Environmental Protection Agency (EPA) in 1980. For potential carcinogens (cancer producing agents), a water concentration of zero was recommended by the EPA. However, if a zero level is not obtainable, the EPA recommended three other concentrations, one of which is the one in 1,000,000 level incorporated into the second paragraph of Regulation 1–101.X. This exhibit is substantial evidence for the adoption of the cancer standard in Regulation 1–101.X.

### Fair Hearing

■ The Companies rely on *Kerr-McGee Nuclear Corporation v. New Mexico Environmental Improvement Board*, 97 N.M. 88, 637 P.2d 38 (Ct.App.1981) (Wood, Specially Concurring), for their argument that the regulations are invalid because the Companies were not given a fair and impartial hearing. We hold the hearing was fair and impartial.

In *Kerr-McGee, supra*, regulations adopted by the Environmental Improvement Board (Board) were held to be invalid because the EID participated in drafting the regulations, counseled the Board, and also

---

4. Although the Supreme Court in *Bokum, supra*, stated that the discharge of a toxic pollutant is a criminal act, we do not believe that is what they meant. We believe they meant essentially what we have described above, that is, that the discharge of a toxic pollutant *in violation of a discharge plan* is the prohibited act.

5. The standard to be used here is the same as for findings by a court: If there is substantial

evidence, the finding or regulation must be upheld. In determining whether there is substantial evidence, this Court must view the evidence in the most favorable light to support the finding, and only favorable inferences will be drawn. *United Veterans Org. v. New Mexico Prop. App. Dept.*, 84 N.M. 114, 500 P.2d 199 (Ct.App.1972).

acted as an interested party at the regulation hearings. These factors were held to be indicative of an unfair hearing vis-a-vis the Companies. The Companies here contend that the statutes for Commission hearings are identical to those in the *Kerr-McGee, supra,* case and, since the EID prepared the regulations in this case and then acted as an interested party, the regulations are invalid.

This case differs from *Kerr-McGee, supra,* in one major aspect. Unlike the Environmental Improvement Board, the Water Quality Control Commissionis comprised of members of eight environmental or other state agencies, plus a representative of the public. Section 74–6–3, N.M.S.A.1978 (Repl.1981), provides that the members of the Commission shall be the director of the environmental improvement division, the director of the New Mexico department of game and fish, the state engineer, the secretary of the oil conservation commission, the director of state park and recreation, the director of the department of agriculture, executive secretary of the state natural resource conservation commission, the director of the bureau of mines, and a representative of the public appointed by the governor. Each agency head may then designate a member of his staff to represent him if desired. Section 74–6–3, *supra.* This serves the purpose of having expertise on the Commission which deals with highly technical and complicated matters. *See,* § 74–6–4, N.M.S.A.1978 (Repl.1981). The agency members of the Commission are also the same as the constituent agencies. Section 74–6–2(J), N.M.S.A.1978 (Repl.1981). These constituent agencies are granted certain powers (§ 74–6–9, N.M.S.A.1978 (Repl. 1981)), among which is to recommend regulations for adoption by the Commission. It is not difficult to see the wisdom behind this section. Agencies which deal with certain technical aspects of water quality and quantity are better able to keep a continuing study of their particular duties as are charged by law. They have the expertise. By contrast, the New Mexico Environmental Improvement Board consists simply of "five members appointed by the governor".

Section 74–1–4, N.M.S.A.1978 (Repl.1981). In light of the fact that the Legislature has seen fit to have the Director of the EID sit as a member of the Commission, we decline to hold that because the EID proposed regulations to the Commission and then acted as an interested party at the hearings, that the Companies were denied a fair and impartial hearing. The legislative scheme does not support the Companies' position.

*Delegation of Authority*

■ The Companies contend the Commission, in adopting the regulations in question, unlawfully delegated its authority and functions to the EID and the Director. They argue it is unlawful delegation for two reasons. First, the Director is allowed to determine at what concentration a compound constitutes a toxic pollutant. Second, the preparation of the regulations was delegated to the EID, which also appeared as an interested party at the hearings. The Commission responds that there is no delegation and, even if there were, it is lawful.

Section 74–6–4(D), *supra,* provides the Commission "shall adopt, promulgate and publish regulations to prevent or abate water pollution in the state * * *."

Under the regulations, there has been no delegation. The Commission set the standards when it adopted the regulations pursuant to § 74–6–4(D), *supra.* The Director merely applies those standards, as allowed in § 74–6–8, N.M.S.A.1978 (Repl.1981): "Each constituent agency shall administer regulations adopted pursuant to * * * [74–6–4, N.M.S.A.1978], responsibility for the administration of which has been assigned to it by the commission." Since the Commission gave the EID the authority to administer certain regulations, we hold there has been no delegation.

Even if there were delegation of authority in this instance, it would be lawful. In *National Labor Relations Bd. v. Duval Jewelry Co.,* 357 U.S. 1, 78 S.Ct. 1024, 2 L.Ed.2d 1097 (1958), the United States Supreme Court held where the ultimate decision on the merits of the issue does not rest with

the delegate, the delegation is permissible. In that case, the National Labor Relations Board delegated its statutory power to issue and revoke subpoenas to hearing officers. Rulings of the hearing officer could be appealed to the National Labor Relations Board if special permission was granted. The court, expressing sympathy for an administrative agency's need for assistance in matters of this sort, held "[w]hile there is delegation here, the ultimate decision on a motion to revoke is reserved to the Board [NLRB], not to a subordinate. All that the Board has delegated is the preliminary ruling on the motion to revoke. It retains the final decision on the merits * * *. The fact that special permission of the Board is required for the appeal is not important."

Under *Duval, supra,* any delegation of authority from the Commission to the EID is lawful. Instead of an appeal from the decisions of the Director of the EID, § 74–6–5(L) and (M), N.M.S.A.1978 (Repl. 1981), provide for a de novo hearing before the Commission. The petitioner may submit evidence orally or in writing. The fact that the burden of proof is on the petitioner at the hearing does not invalidate the delegation as suggested by the Companies. Since the appellant has the burden where the only recourse is a traditional appeal, and that did not invalidate the procedures in *Duval, supra,* we cannot hold that the regulations in the case at bar are invalid because the discharger has the burden of proof at the trial de novo. Accordingly, any reliance by appellants on *Kerr-McGee Nuclear Corporation, supra,* is misplaced.

We hold the Commission's regulations are valid.

IT IS SO ORDERED.

LOPEZ and DONNELLY, JJ., concur.