757 P.2d 1213

**Alfie MELLINGER,
Petitioner–Appellant,**

v.

**IDAHO DEPARTMENT OF
CORRECTIONS,
Respondent.**

**No. 16826.**

Court of Appeals of Idaho.

June 2, 1988.

Alfie Mellinger, pro se.

Jim Jones, Atty. Gen., Timothy D. Wilson, Deputy Atty. Gen., for respondent.

SWANSTROM, Judge.

Alfie Mellinger, an inmate at the Idaho State Correctional Institution (ISCI), appeals a decision of the district court which affirmed a magistrate's order denying relief on Mellinger's petition for a writ of habeas corpus. In the petition, Mellinger raised issues relating to work release and parole. We affirm for the reasons explained below.

Effective February 1985, the work release program at the ISCI was discontinued. The program was transferred to and administered by the Community Work/Restitution Center (CWC). Inmates at the ISCI would no longer be approved for work release from that institution. Instead, eligible inmates would be transferred to the CWC to participate in work release. Mellinger challenges this administrative decision.

In January 1985, Mellinger appeared before the Idaho Commission for Pardons and Parole, and received a March 21, 1985, tentative parole date. The Commission requested the Board of Correction, Division of Probation and Parole, to investigate the risks and needs of Mellinger's parole, and recommend a level of supervision. Probation and Parole recommended the "Intensive Supervision Program" (ISP) because of Mellinger's prior two unsuccessful attempts at parole. The ISP was developed and approved by the Board of Correction in December 1984. As the name denotes, the ISP is designed for high accountability. It mandates strict compliance by the parolee with its rigid conditions and requires a high level of supervision.

The executive director of the Commission, acting in behalf of the Commission, approved the ISP recommendation as part of Mellinger's overall parole plan. Mellinger was not notified in advance that his agreement to the ISP would be a prerequisite for parole. The Commission's order granting parole contained several conditions agreed to by Mellinger, including the following.

I will: (a) obey all Municipal, County, State and Federal laws; (b) conduct myself in a manner which is not, nor is intended to be, harmful to myself or others; (c) follow written or oral instructions of my parole officer, or of the Commission, intended to assist in my rehabilitation; . . . .

I will: (a) abstain from excessive use of alcoholic beverages; (b) abstain completely from the possession, procurement, use, or sale of narcotics (controlled substances) except as prescribed by a licensed medical practitioner; (c) freely cooperate and voluntarily submit to medical and chemical tests and examinations for the purpose of determining if I am using or under the influence of alcohol or narcotics; [and] (d) participate in treatment programs as specified by the Commission or ordered by my parole officer.

. . . .

I will submit to search of my person or property, conducted in a reasonable manner and at a reasonable time, by a probation or parole officer.

On the day of his release, Mellinger executed, at the insistence of his parole officer, the Board of Correction's INTENSIVE SUPERVISION AGREEMENT. This agreement imposed the following pertinent conditions.[1]

> I will not leave the city limits of Boise/Garden City without prior written permission from my supervising officer.
>
> . . . .
>
> I will remain alcohol and drug free and will not enter any place where alcohol is the main source of income.
>
> I will submit to tests for controlled substances or alcohol at my own expense upon entering the program and will submit to tests throughout the time I am in the Intensive Probation and Parole Program. The cost of each drug detection test will be $10.00.
>
> I will remain at my place of residence between the hours of *6:30 p.m.* and *6:30 a.m.* on days that I am employed or seeking employment and will remain at my residence between the hours of *all* ~~and~~ *times* on days that I am not employed. [Deletion original.]

Compliance with all these conditions was verified through frequent, unannounced home visits and telephone calls by the intensive supervision team.

Between March 21 and April 3, Mellinger's intensive supervision team had face-to-face contact with him on nine occasions at his girl friend's house—Mellinger's designated place of residence for parole. Mellinger's girl friend had been contacted prior to Mellinger's release and was informed of the nature and manner of the anticipated home visits. Six of these home visits occurred between 2:00 a.m. and 6:00 a.m.; the remaining three were between 8:00 p.m. and 11:00 p.m. On March 31, Mellinger was absent when his parole officer made a home visit. Mellinger's absence was a violation of his parole conditions. In addition, during an April 1 home visit, a parole offi-

cer determined Mellinger had been drinking beer. Mellinger's symptoms indicated excessive alcohol consumption. Mellinger admitted drinking beer but claimed it was not excessive. A urine sample was obtained and tested, confirming Mellinger had been drinking. On April 3, Mellinger was arrested and incarcerated on a parole agent's warrant for the above violations.

The Commission served Mellinger with notice of the violations. A preliminary hearing was held at the ISCI on May 1. At this hearing Mellinger waived his right to present documents or witnesses, expressed that he did not want an attorney to represent him, and admitted the violations. The hearing officer found probable cause for the Commission to hear the parole violation. On May 21, a parole violation hearing was conducted before the Commission. Mellinger again expressly waived his right to present evidence, and said he did not want to be represented by an attorney. He admitted the violations but argued that the ISP was too restrictive and that he was forced into accepting it to gain parole. The Commission revoked Mellinger's parole.

Mellinger's petition for a writ of habeas corpus challenged the constitutionality of the work release policy, the ISP, and his revocation hearing. The magistrate issued the writ, but following a hearing on the merits, determined Mellinger was not entitled to relief. The magistrate's order denying relief provides a scholarly analysis of Mellinger's allegations; so too does the district court's decision affirming the magistrate's order. Mellinger's appeal presents the following issues: (1) whether discontinuance of the ISCI work release program, and implementation of the ISP, constitutes laws *ex post facto;* (2) whether the Commission had authority to, and properly did, apply the ISP as additional parole conditions; (3) whether Mellinger is estopped from challenging the parole conditions of the ISP; (4) whether the frequent home visits at all hours violated a constitutional

---

**1.** Mellinger complains of being required to perform 180 hours of community service as a con-
dition of parole; however, we are unable to find any such condition in the record before us.

right to privacy; and (5) whether the revocation hearing lacked procedural due process.

On appeal from a decision of the district court reviewing a magistrate's order, we will treat the district court as an intermediate appellate court and we will independently review the magistrate's findings. *State v. Hayes*, 108 Idaho 556, 700 P.2d 959 (Ct.App.1985). Findings of fact by a trial court will not be disturbed on appeal unless they are clearly erroneous. I.R.C.P. 52(a). Consequently, our standard for reviewing a trial court's findings and conclusions is to determine whether they are supported by substantial, competent evidence, and to determine whether the trial court properly applied the law to the facts as found. *See Rasmussen v. Martin*, 104 Idaho 401, 659 P.2d 155 (Ct.App.1983).

## I

■ The United States Constitution, at article 1, § 10, and the Idaho Constitution, at article 1, § 16, prohibit the enactment of *ex post facto* laws. An *ex post facto* law is:

> 1st, every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.

*State v. Byers*, 102 Idaho 159, 627 P.2d 788 (1981) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798)). The change in the ISCI administration policy, discontinuing the work release program, does not punish a prior innocent act, aggravate a crime, or change the punishment for a crime. Inmates who demonstrate eligibility for work release may be transferred to the CWC for participation in the program. Mellinger has neither alleged nor shown how this administrative change affects his constitutional rights; if indeed, any such

rights are affected. *See Baumann v. Arizona Dept. of Corrections*, 754 F.2d 841 (9th Cir.1985). Mellinger has not shown that he is eligible for the program but was arbitrarily denied participation in it.

Mellinger also asserts that the work release change is in violation of I.C. § 20–230. He construes the phrase "at all times the same provisions relating to sentences, imprisonment, and paroles of prisoners shall apply to the inmates thereof," to mean that, once a program is adopted, it must remain "at all times" for eligible inmates. We are not persuaded. The work release program is a discretionary program with the ISCI administration. *See* I.C. § 20–242. Moreover, all eligible inmates may participate in the program; it will simply not be administered through the ISCI. We conclude that I.C. § 20–230 was not violated, and that the change in administration policy for the work release program is not an *ex post facto* law.

■ We now examine whether the ISP is a law *ex post facto*. As a preliminary matter, we again emphasize the nature of parole in Idaho. It has been said that parole "is not a matter of right or privilege. It is a matter of grace or clemency only." *Malloroy v. State*, 91 Idaho 914, 915, 435 P.2d 254, 255 (1967). *See also Vittone v. State*, 114 Idaho 618, 759 P.2d 909 (Ct. App.1988); *State v. Flores*, 109 Idaho 182, 183, 706 P.2d 71, 72 (Ct.App.1985) ("Parole is a gratuity....") Because parole is a "gratuity," it will be ordered only for the best interests of society when the Commission believes the prisoner no longer poses a threat to society and is able and willing to fulfill the obligations of a law abiding citizen. I.C. § 20–223. The interests of society are best served when a parolee's assimilation into society is structured and supervised. The conditions fashioned for the parolee's rehabilitative needs provide the structure. Supervision is the means for measuring rehabilitative progress. Adherence to the parole plan not only protects a parolee's limited liberty but demonstrates

his ability and willingness to fulfill the obligations of a law abiding citizen.

Parole conditions are not additional punishments or penalties to the crime for which a person was sentenced and incarcerated. The conditions provide the structure necessary to assist a parolee's rehabilitation. Their violation may simply result in the loss of parole. Consequently, implementation of the ISP in Mellinger's case did not violate the *ex post facto* prohibition.

## II

Mellinger's second issue is whether the Commission has authority to add the ISP conditions to his parole. He claims that such action by the executive branch of government usurps the judicial branch's authority to sentence criminal offenders. He further asserts that such action is an unlawful delegation of authority from the Legislature to the executive branch. This, he contends, violates the separation of powers doctrine of Idaho Constitution, article 2, § 1.

We have already stated that the parole conditions do not *add* to a sentence. Parole merely allows the convicted party to serve part of his sentence under conditions other than those of prison. *Standlee v. State*, 96 Idaho 849, 538 P.2d 778 (1975). Therefore, no intrusion upon the judiciary's role has occurred.

Idaho Constitution, article 10, § 5, mandates the establishment of the Board of Correction. "This Board shall have the control, direction and management of the penitentiaries of this state, their employees and properties, and of adult probation and parole, with such compensation, powers, and duties as may be prescribed by law." *Id.* The Legislature implemented this constitutional directive by enacting I.C. §§ 20–201 to –249. The Board's prescribed powers include the power to appoint a state

Commission of Pardons and Parole, I.C. § 20–210; the power to make all necessary rules and regulations to carry out its duties, I.C. § 20–212; and the power to fix the duties of such persons necessary for the administration of the parole and probation system, I.C. § 20–214. The Board, with its constitutionally anchored control over prisons, paroles and probations, is recognized as an agency of the executive branch. *See Spanton v. Clapp,* 78 Idaho 234, 299 P.2d 1103 (1956); I.C. § 20–201(3). The Commission is a closely related but separate executive body. The enabling acts of the Legislature involved no delegation of legislative authority to either body. The Board ultimately derives its powers from article 10, § 5 of the Idaho Constitution. The Commission has its origin in article 4, § 7. Accordingly, we hold that there has been no unlawful delegation of legislative authority to the executive branch.[2]

The question remains whether the Commission properly exercised its authority in approving the ISP conditions as part of Mellinger's parole. Mellinger contends that the Commission cannot delegate to the Board the authority to set conditions for parole. Further, he asserts that the procedure of allowing the executive director of the Commission to approve parole conditions in behalf of the Commission is unlawful.

Under I.C. § 20–223, the Commission has sole power to determine eligibility for parole. The Commission is further mandated to specify in writing the conditions of parole. I.C. § 20–228. The Board, on the other hand, retains legal custody *and control* of the parolee. Accordingly, the Board also has the duty to supervise all probationers and parolees, make necessary investigations, report violations to the Commission or courts, and prepare case histo-

---

2. The Commission of Pardons and Parole was originally known as the Board of Pardons. The same state executive officials once acted as the Board of Pardons and as "state prison commissioners"—now the Board of Correction. By constitutional and statutory amendments, these two executive boards now have separate members although their work remains closely related.

ries to assist the Commission or courts in making parole or probation decisions. I.C. § 20–219. The magistrate construed these statutes to allow only the Commission to impose substantive, rehabilitative conditions of parole. The Board may recommend substantive conditions, but it may only impose supervisory conditions. The district court agreed with this reasoning. We too are persuaded by the magistrate's analysis.

■ The Board's duties are supervisory in the main with ancillary duties of investigation and reporting. The Commission, on the other hand, has sole responsibility for determining parole eligibility and must specify in writing the parole conditions. Here, the Commission requested the Board to recommend a supervisory level. The Board recommended the ISP which contains both supervisory and substantive conditions. This procedure involved no unlawful delegation of authority. However, the substantive conditions recommended by the Board cannot be imposed without the Commission's approval. This brings us to the question whether the Commission may delegate this authority to the executive director.

The Commission members are given the responsibilities of determining parole eligibility, I.C. § 20–223, and making pardon and commutation decisions. IDAHO CONST. art. IV, § 7. These functions are quasi-judicial in character—requiring the exercise of judgment in determining facts and applying legal standards entrusted to the Commission by law, and cannot be delegated. *E.g., Kerr–McGee Nuclear Corp. v. New Mexico Environmental Improvement Board,* 97 N.M. 88, 637 P.2d 38 (App. 1981); *Anderson v. Grand River Dam Authority,* 446 P.2d 814 (Okla.1968). However, administrative functions may be delegated, absent a statute prohibiting the same. *Anderson v. Grand River Dam Authority, supra.*

The acceptance and approval of the Board's recommended parole conditions do not require fact-finding and the application of standards to those facts. The Board's supervision agreements, including the ISP, are merely common forms with set conditions and rules. The facts as found by the magistrate reveal that the Commission is familiar with all parole conditions and supervisory levels recommended by the Board and that it is the Commission's practice to administratively approve the Board's recommendations. This is simply the exercise of common sense. It is the Board's duty to investigate the risks and needs of a prospective parolee and report the same to the Commission. I.C. § 20–219. The Commission should be able to rely on the Board's information and recommendation. The statutes do not prohibit the Commission from summarily approving recommended parole conditions. All that is statutorily required of the Commission is to specify in writing the parole conditions. I.C. § 20–228. Consequently, written parole conditions may be administratively accepted and approved.

■ The Commission is composed of five private citizens who serve on a part-time basis. The executive director is described as the spokesperson for the Commission; however, the director is not a member of the Commission. Rather, the director serves as a full-time employee for the Commission. The director's duties include handling the daily administration of the Commission, acting as an advisor to the Commission, and acting as a liaison between the public and the Commission. A review of the pertinent statutes reveals that there is no prohibition against delegation of such authority to the director. As explained, the approval of recommended parole conditions is, pragmatically, part of the daily administration of the Commission. We agree that the Commission may lawfully delegate specific authority to the director to act in its behalf in approving the Board's recommended parole conditions.

■ The magistrate, however, found no formal delegation of this authority,[3] but determined that the Commission ratified the ISP conditions. The Commission, at the revocation hearing, did not question the validity of the ISP conditions applied to Mellinger. The Commission's act of revoking Mellinger's parole for violating those conditions may be inferred as a ratification of the director's approval. This adoption or confirmation of the director's approval is equivalent to a previous authorization and relates back to time when act ratified was done. *Blackwell v. Kercheval,* 27 Idaho 537, 149 P. 1060 (1915).

The magistrate did not rely solely on the fact that the Commission had ratified the director's prior approval of the ISP conditions of parole. The magistrate also concluded that "any parolee who has accepted those conditions, thereby obtaining his release, is estopped from attacking the validity of those conditions *on the basis of defects in the administrative procedure followed in imposing such conditions,*" citing *Sheppard v. State ex rel. Eyman,* 18 Ariz.App. 108, 500 P.2d 639 (1972), *overruled on other grounds, Thomas v. Arizona State Board of Pardons and Paroles,* 564 P.2d 79 (Ariz.1977) (emphasis added). *Compare State v. Gawron,* 112 Idaho 841, 736 P.2d 1295 (1987) (discussing a probationary term giving consent to searches and waiver of fourth amendment rights). The magistrate may have been correct in his conclusion, but we need not decide that question today. The magistrate considered Mellinger's further arguments that the ISP conditions were unreasonable and that they authorized unlawful "searches," and so will we.

### III

■ Parole conditions must be reasonable and must have an acceptable aim toward rehabilitation. *People v. Burgener,* 41 Cal.3d 505, 224 Cal.Rptr. 112, 714 P.2d 1251 (1986). A parole condition authorizing

warrantless searches is reasonable and will assist in the supervision of a parolee. *See, e.g., State v. Gawron, supra* (decided after the second appeal was taken here). A parole officer has lawful authority to request entrance into a parolee's home. The officer's mere entrance into the home does not, in itself, constitute a search or an unreasonable intrusion. *State v. Pinson,* 104 Idaho 227, 233, 657 P.2d 1095, 1101 (Ct. App.1983). Requiring the payment of fees to defray costs of supervision is reasonable and has a rehabilitative effect. *State v. Mears,* 134 Ariz. 95, 654 P.2d 29 (App. 1982). Testing for use of prohibited substances is a reasonable condition for parole as an aid in supervision and rehabilitation of a parolee. *Smith v. State,* 250 Ga. 438, 298 S.E.2d 482 (1983). Restrictions on the use of alcohol, even complete abstinence, may be reasonably related to the goal of rehabilitation. *State v. Sullivan,* 197 Mont. 395, 642 P.2d 1008 (1982) (construing *State v. Oyler,* 92 Idaho 43, 436 P.2d 709 (1968)); *Rosser v. Housewright,* 99 Nev. 476, 664 P.2d 961 (1983) (construing *State v. Oyler, supra* ). Conditions establishing a curfew may be reasonable and helpful in promoting rehabilitation. *State v. Donovan,* 116 Ariz. 209, 568 P.2d 1107 (App. 1977). Geographic restrictions also may be reasonable means of supervision and rehabilitation. *See Bagley v. Harvey,* 718 F.2d 921 (9th Cir.1983); *People v. Ison,* 132 Mich.App. 61, 346 N.W.2d 894 (1984). In sum, the conditions imposed on Mellinger were reasonable, were possible to perform, and had an acceptable aim toward rehabilitation.

### IV

■ Mellinger has contended that the nighttime visits by parole officers to the home where he was staying were gross invasions of his and his girl friend's privacy and were in fact "searches" of the home. The state contends that no "searches" were

---

3. The Commission was instructed by the magistrate to follow the Idaho Administrative Procedure Act in formally delegating authority to the director. We note that the Commission promptly responded to this directive by establishing a formal policy.

conducted and that the nighttime visits were necessary to assure Mellinger's compliance with the strict curfew requirements imposed by the parole agreement. The magistrate, faced with conflicting testimony, found Mellinger's testimony to be "completely lacking in credibility." The magistrate held—and the district court concurred fully—that the visits were minimally intrusive and did not constitute "searches."

In this appeal we have not been provided with a transcript of the hearing before the magistrate. Accordingly, we are in no position to determine whether any "searches" were involved in the nighttime visits to the home where Mellinger was staying. We need be concerned here only with the visits to the home at 5:15 p.m. on March 31, 1985, and the visit at 8:11 p.m. on April 1. These are the only occasions that were considered by the Parole Commission in determining that Mellinger had violated his parole. On March 31, the parole officers simply determined that Mellinger was not home. On April 1, the parole officers visited with Mellinger in the home and determined that he had been drinking.

Even if—as Mellinger contends—these visits somehow involved "searches," we hold that they are not shown to be unreasonable. The visits were authorized—indeed required—by the intensive supervision program, were made at reasonable hours, and were made to determine Mellinger's compliance with the terms of parole. Mellinger had previously signed the Commission's standard conditions of parole, consenting to searches "conducted in a reasonable manner and at a reasonable time." These two visits, at least, undisputedly fall within the scope of consent given. *See State v. Gawron, supra.* Accordingly, we hold that the evidence used to revoke Mellinger's parole was not the product of any violation of Mellinger's constitutional rights against unreasonable searches.

V

Mellinger's final issue is whether he was denied procedural due process at his revocation hearing. Specifically, he maintains that he was not allowed to present witnesses or have an attorney appointed to represent him. The lower courts determined that Mellinger was not denied these rights, but that he waived them.

In parole revocation hearings, a parolee has the right to testify, present documents and witnesses, and cross-examine the state's witnesses. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). There is no constitutional right to counsel in parole revocation hearings. Rather, the decision whether to appoint an attorney rests with the fact-finding authority. *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). The court in *Gagnon* noted that participation by counsel in such hearings would be unnecessary in most cases, but explained that counsel may be appropriate where difficult or complex issues are presented. However, if counsel is requested and refused, the reason for denial must be set forth in the record. *Id.*

According to the record, Mellinger expressly waived his right to present documents or witnesses. Likewise, Mellinger expressed that he did not want an attorney. The issues in Mellinger's revocation hearing were not difficult or complex. Moreover, he admitted the alleged violations. Upon these facts we conclude that Mellinger was not denied due process in his parole revocation hearing.

In summary, the magistrate correctly denied the relief Mellinger sought in his habeas corpus action. The district court correctly affirmed the magistrate's order. Accordingly, we affirm the decision of the district court.

WALTERS, C.J., and BURNETT, J., concur.