Docket No. 99676.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
RICHARD MORRIS, Appellee.

*Opinion filed April 20, 2006.*

JUSTICE McMORROW delivered the judgment of the court,
with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald,
Kilbride, and Garman concurred in the judgment and opinion.

Justice Karmeier dissented, with opinion.

## OPINION

The defendant, Richard Morris, was convicted of first
degree murder and other offenses and sentenced to death.

While his case was pending before this court on direct appeal, then-Governor George H. Ryan issued a clemency order which stated that defendant's death sentence was commuted to natural life imprisonment without the possibility of parole or mandatory supervised release. Thereafter, this court retained jurisdiction of the case, reversed defendant's conviction and remanded the cause for a new trial. See *People v. Morris*, 209 Ill. 2d 137 (2004).

On remand, the State indicated that if defendant should be convicted following retrial, it would again seek a sentence of death. Defendant, relying on the former Governor's clemency order, moved the circuit court to bar the State from pursuing the death penalty. In a written order, the circuit court granted defendant's motion. The State then sought, and was granted, direct appeal to this court under Supreme Court Rule 302(b) (134 Ill. 2d R. 302(b)). For the reasons that follow, we affirm the order of the circuit court.

Background

Following a jury trial in the circuit court of Cook County, defendant was convicted of first degree murder, aggravated vehicular hijacking and aggravated kidnapping. Defendant was sentenced to death on the first degree murder conviction and his case was appealed directly to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603). Oral argument was held and the case was taken under advisement.

On January 10, 2003, while defendant's case was still under advisement, former Governor George H. Ryan gave a public speech at Northwestern University Law School in which he announced that he was exercising the clemency authority given him under the Illinois Constitution (Ill. Const. 1970, art. V, §12), and "commuting the sentences of all death row inmates." See Governor George Ryan, Address at Northwestern University Law School (January 11, 2003); *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457, 462 (2004). In the speech, the former Governor discussed several problems that he believed existed with the death penalty in Illinois and stated that he was granting a "blanket commutation" because, in his view, the "Illinois capital punishment system is broken." Governor George Ryan, Address at Northwestern University Law School (January 11, 2003); *Snyder*, 208 Ill. 2d at 468. The

same day that he delivered the speech, the former Governor issued clemency orders for each of the death row inmates, including defendant. Defendant's clemency order stated:

> "Whereas, Richard Morris B–65709 was convicted of the crime of Murder, Case #96 CR 00123–01 in the Criminal Court of Cook County and was sentenced January 29, 1999 to Death and whereas it has been represented to me that said Richard Morris B–65709 is a fit and proper subject for Executive Clemency.
>
> Now, Know Ye, that I, GEORGE H. RYAN, Governor of the State of Illinois, by virtue of the authority vested in me by the Constitution of this State, do by these presents:
>
> COMMUTE THE SENTENCE OF
>
> Richard Morris
>
> Sentence Commuted to Natural Life Imprisonment Without the Possibility of Parole or Mandatory Supervised Release[.]"

Following the issuance of the clemency orders, the Illinois Attorney General filed an original action in this court which challenged the validity of the orders with respect to two categories of death row inmates. See *Snyder*, 208 Ill. 2d 457. The first category consisted of a group of inmates who had failed to sign or otherwise consent to their clemency petitions. The Attorney General maintained that, pursuant to statute, the Governor had no authority to grant clemency to these inmates. *Snyder*, 208 Ill. 2d at 462-63. The second category consisted of a group of inmates who had been sentenced to death, but whose sentences had been reversed on direct appeal or in postconviction proceedings. These inmates were awaiting new sentencing hearings at the time the clemency orders were issued. For most of the inmates in this category, the clemency orders stated that their sentences were "Commuted to a Sentence Other Than Death for the Crime of Murder, So that the Maximum Sentence that may be Imposed is Natural Life Imprisonment Without the Possibility of Parole or Mandatory Supervised Relief [*sic*]." See *Snyder*, 208 Ill. 2d at 464. The Attorney General maintained that the Governor had no authority to grant a preemptive commutation to these

"unsentenced" inmates and that he had improperly encroached upon the judiciary's sentencing powers in doing so. *Snyder*, 208 Ill. 2d at 463-64.

This court rejected the Attorney General's challenges to both categories of inmates. With respect to the "unsentenced" inmates we stated:

"This is a difficult question with little to guide us, but we believe that the grant of authority given the Governor under article V, section 12, is sufficiently broad to allow former Governor Ryan to do what he did. As set forth above, the Governor's clemency powers, which attach upon an adjudication of guilt, allow him to mitigate or set aside the punishment for the crime by issuing a pardon. Pardons may be full or partial, removing some or all of the legal consequences of a crime, and may be absolute or imposed with conditions. Further, the Governor can grant a reprieve for any sentence imposed and may commute any sentence imposed to a lesser sentence. In this situation, what former Governor Ryan essentially did was to grant the inmates listed in count II a partial pardon by pardoning only the possible capital consequences of the offense. As we noted, a partial pardon exonerates a defendant from some but not all of the punishment or legal consequences of a crime. Black's Law Dictionary 1113 (6th ed. 1990); *Anderson v. Commonwealth*, 107 S.W.3d 193, 196 (Ky. 2003) (construing power of the governor to issue 'pardons' under state constitution as including power to issue partial pardons). The Governor's pardon power allows him to remove or mitigate the consequences of a crime, and that is what he did here by removing the maximum sentence for these defendants in future sentencing hearings. We deem it irrelevant that the Governor used the term 'commutation' in his clemency orders, because we believe that it is the substance, not the terminology, of the clemency orders that controls. See *Ex parte Black*, 123 Tex. Crim. 472, 474, 59 S.W.2d 828, 829 (1933) (construing governor's clemency order to be a 'reprieve' even though governor

used the word 'furlough'; 'it is the substance of the proclamation of the governor and not the name by which it is designated, that controls its effect'). We emphasize the limited nature of our holding. We hold only that the Governor's constitutional authority to issue pardons after conviction is sufficiently broad to allow him to reduce the maximum sentence the defendant is facing. In such a situation, the Governor is exercising his power to prevent or mitigate punishment by pardoning the defendant from the full extent of the punishment allowed by law." *Snyder*, 208 Ill. 2d at 476-77.

Defendant in the case at bar was one of the death row inmates who did not sign his clemency petition. Consequently, his case remained under advisement in this court, pending the resolution of the Attorney General's complaint in *Snyder*. Following our decision in *Snyder*, we retained jurisdiction of defendant's case and entered judgment on defendant's direct appeal. See *Morris*, 209 Ill. 2d 137.

In *Morris*, we concluded that defendant's trial counsel committed fundamental and indefensible errors during the course of trial. As a result, "there was a breakdown of the adversarial process during defendant's trial such that there was no meaningful adversarial testing of defendant's case." *Morris*, 209 Ill. 2d at 188. Accordingly, we held that defendant was denied the effective assistance of trial counsel. We reversed defendant's convictions, and remanded the cause for a new trial. *Morris*, 209 Ill. 2d at 188.

On remand, the State indicated that, despite the clemency order entered by former Governor Ryan, it again intended to seek the death penalty against defendant. In response, defendant filed a "Motion to Preclude the State From Seeking Imposition of the Death Penalty." In support of this motion, defendant pointed to this court's discussion regarding the "unsentenced" inmates in *Snyder*. Defendant noted that, in *Snyder*, we concluded that the clemency orders entered for the "unsentenced" inmates were, in essence, partial pardons which removed the maximum sentence possible, *i.e.*, death, for those inmates. *Snyder*, 208 Ill. 2d at 476-77. Defendant maintained

that his clemency order also acted as a partial pardon which removed the death penalty as a possible sentence if he were again to be convicted. According to defendant, "[t]he governor's clemency order was not conditional. It was absolute. The governor did not qualify his order by granting the defendant clemency from the death penalty only if his conviction were affirmed on appeal, or by stating that the clemency order would not apply to any inmate whose conviction was subsequently reversed on appeal and remanded for a new trial."

The State, in reply, noted that the clemency orders for the "unsentenced" defendants discussed in *Snyder* differed from defendant's. As noted, the clemency orders for the "unsentenced" inmates stated that their sentences were "Commuted to a Sentence Other Than Death for the Crime of Murder, So that the Maximum Sentence that may be Imposed is Natural Life Imprisonment Without the Possibility of Parole or Mandatory Supervised Relief [*sic*]." See *Snyder*, 208 Ill. 2d at 464. The State maintained that the foregoing language indicated that the Governor intended to restrict the outcome of future judicial proceedings for the "unsentenced" inmates. In contrast, the State noted, defendant's clemency order states only that defendant's sentence is commuted, without any further qualifying language. Thus, according to the State, the Governor had no intention to limit the sentence that defendant could receive following retrial and the State was free to pursue the death penalty against defendant.

In addition to arguing that his clemency order was, in substance, a partial pardon, defendant also contended in his motion that the imposition of the death penalty on retrial would violate his due process rights and the statutory prohibition against increasing a sentence on remand under section 5–5–4(a) of the Unified Code of Corrections (730 ILCS 5/5–5–4(a) (West 2004)). Defendant further maintained that the State's action in seeking the death penalty on retrial constituted prosecutorial vindictiveness.

Following argument, the circuit court granted defendant's motion. With respect to defendant's argument that his

˘6˘

clemency order acted as a partial pardon, the circuit court stated:

> "Resolution of this issue must necessarily rest upon a determination of the Governor's intent in his grant of clemency. As the supreme court has recognized, the pardon power given the Governor in article V, section 12, is extremely broad. [*Snyder*, 208 Ill. 2d at 473.] In construing a governor's clemency order, it is the substance not the terminology of the order that controls. *People v. Collins*, [351 Ill. App. 3d 959, 962 (2004)]. Here, the Governor's public announcement on January 10, 2003, that he was granting blanket clemency informs our understanding of his intent. '...today I am commuting the sentences of all death row inmates.' [Governor George Ryan, Address at Northwestern University Law School (January 11, 2003).] The State misreads the teaching of *People ex rel. Madigan*. Under the supreme court's rubric and rationale in interpreting the Governor's exercise of power, it is reasonable to conclude that he intended to grant a partial pardon to all of the inmates then residing on death row. His actions accordingly served to invoke the fundamental protections provided by the double jeopardy clause and to bar the State from again seeking a sentence of death against this defendant."

The circuit court also agreed with defendant's contention that imposition of the death penalty would violate his due process rights and section 5–5–4(a) of the Unified Code of Corrections. However, the circuit court rejected defendant's argument regarding prosecutorial vindictiveness. The circuit court granted defendant's motion and barred the State from seeking the death penalty.

The State then sought, and was granted, direct appeal to this court under Rule 302(b) (134 Ill. 2d R. 302(b)). We subsequently granted leave to former Governor Ryan to file an *amicus curiae* brief.

Analysis

The principal dispute raised on appeal before this court is the nature of the clemency order entered in defendant's case, specifically, whether the order acts as a partial pardon, such that the State is precluded from seeking the death penalty against defendant. The State does not dispute that the Governor has the authority to enter a partial pardon (see *Snyder*, 208 Ill. 2d at 476), and the State expressly acknowledges that "a partial pardon survives the reversal of the conviction." However, as it did in the circuit court, the State contends that defendant's clemency order is a commutation, not a partial pardon, and that the effect of the commutation does not survive the reversal of defendant's conviction.

Defendant maintains, however, that interpreting his clemency order as anything other than a partial pardon would lead to absurd results. Defendant notes that one of the principal reasons former Governor Ryan gave for issuing the blanket clemency was the frequency with which defense attorneys were providing inadequate counsel during capital trials. Defendant observes that this was the same reason that his conviction was reversed by this court. Defendant argues that the former Governor could not possibly have intended for the death penalty to be imposed upon a defendant, such as himself, who has established one of the very things that led to the blanket clemency in the first place.

In addition, defendant maintains that the only difference between his case and those of the "unsentenced" inmates in *Snyder* who were partially pardoned is one of procedural posture–the "unsentenced" inmates had already had their death sentences overturned at the time the clemency orders were issued while defendant's reversal came after the orders were announced. Defendant contends that, because there is no substantive difference between his case and the "unsentenced" inmates, the former Governor could not have intended that his case be treated any differently than their cases. Moreover, according to defendant, to treat his case differently than the "unsentenced" inmates' cases would be directly contrary to the Governor's announcement that he was performing a uniform, or "blanket," clemency for all death row inmates.

The circuit court below resolved any confusion regarding the proper interpretation of defendant's clemency order by referring to the speech given by the former Governor at the time the clemency orders were announced. The circuit court explained that the former Governor's announcement "that he was granting blanket clemency informs our understanding of his intent." Based on the speech, and this court's holding in *Snyder*, the circuit court concluded that it was "reasonable to conclude that he [the former Governor] intended to grant a partial pardon to all of the inmates then residing on death row." Accordingly, the circuit court held that the State was barred from again seeking a sentence of death against defendant.

The State, however, contends that the circuit court erred when it relied on the former Governor's speech to discern his intent regarding defendant's clemency order. The State notes that the Governor's clemency power cannot be controlled by the courts or the legislature. From this, the State maintains that in order to ensure the constitutionally required separation of powers, judicial construction of clemency orders must be limited solely to the language of the order. The State contends that the circuit court in this case, when it tried to discern the former Governor's intent by referring to the speech, "essentially assumed control of the governor's clemency authority and concluded that defendant had received a partial pardon because it presumed that was what Governor Ryan intended." Thus, according to the State, the circuit court's order should be reversed and the State should again be permitted to pursue the death penalty.

Contrary to the State's assertions, separation of powers principles have not been violated in this case. It is a well-established rule of statutory construction that, in determining the intent of the legislature, a court " 'may properly consider *not only the language of the statute*, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved.' (Emphasis added.) *Lieberman*, 201 Ill. 2d at 308, citing *People v. Pullen*, 192 Ill. 2d 36, 42 (2000); *Stern v. Norwest Mortgage, Inc.*, 179 Ill. 2d 160, 164 (1997); *People v. Frieberg*, 147 Ill. 2d 326, 345 (1992). See generally 2A N. Singer, Sutherland on Statutory Construction §48:03 (6th

ed. 2000)." *People v. Hanna*, 207 Ill. 2d 486, 502 (2003). There is no separation of powers violation when a court of law considers the reason for a statute or the purpose the statute is to achieve. Nor is there any separation of powers violation when a court of law applies these same principles of construction to the interpretation of a clemency order. In this case, the former Governor's speech clearly set forth the reasons for the clemency orders, the evils sought to be remedied, and the purpose the clemency orders were meant to achieve. As such, the former Governor's speech was properly considered by the circuit court.

Further, there is no question that the circuit court properly interpreted the meaning of the clemency order in light of the former Governor's speech. In the speech, the former Governor states that the blanket clemency which he ordered was intended to be systemwide, that it was made in response to what he believed to be systemic problems, and that he intended the relief he was granting to extend equally to all inmates on death row. Governor George Ryan, Address at Northwestern University Law School (January 11, 2003). Moreover, in his *amicus* brief filed in this court, the former Governor expressly confirms that the circuit court properly understood the meaning of the speech. The former Governor states that he "expressed his intent clearly in his public address announcing his decision to grant blanket clemency," to wit, "he issued clemency to relieve each inmate of the death penalty as a legal consequence of the offense he had committed." Accordingly, it cannot reasonably be said, as the State contends, that the circuit court violated separation of powers principles in this case by "assum[ing] control of the governor's clemency authority."

The cardinal rule of construction when interpreting a clemency order is to ascertain and give effect to the intent of the Governor. See *Snyder*, 208 Ill. 2d at 476-77 ("it is the substance, not the terminology, of the clemency orders that controls"). Former Governor Ryan's intent is unequivocal in this case. As explained in his speech and reaffirmed in his representations to this court, he issued clemency to relieve defendant "of the death penalty as a legal consequence of the

offense he had committed." To ignore that intent would be an inappropriate intrusion by this court upon the clemency power granted exclusively to the Governor under the Illinois Constitution. Accordingly, we conclude that the State is precluded from pursuing the death penalty in this case.

Conclusion

For the foregoing reasons, the order of the circuit court is affirmed.

*Affirmed.*

JUSTICE KARMEIER, dissenting:

On January 10, 2003, just days before leaving office, then-Governor George H. Ryan issued commutation orders affecting all inmates of the Department of Corrections on death row. Four of those inmates, Madison Hobley, Stanley Howard, Aaron Patterson and Leroy Orange, were pardoned on the grounds that they were actually innocent of the crimes for which they had been sentenced to death. Three, Mario Flores, William Franklin, and Montell Johnson, had their death sentences commuted to a term of 40 years' imprisonment.

Two men, Robert St. Pierre and Patrick Wright, had their death sentences commuted to "Natural Life Imprisonment Without the Possibility of Parole or Mandatory Supervised Relief [*sic*]; or in the alternative, Sentence Commuted to a Sentence Other Than Death for the Crime of Murder, So that the Maximum Sentence that may be Imposed is Natural Life Imprisonment Without the Possibility of Parole or Mandatory Supervised Relief [*sic*]." Similar relief was granted 11 others. Ronald Alvine, William Bracey, Cortez Brown, Roger Collins, Tony Dameron, Tyrone Fuller, Julius Kuntu, Eric Lee, Willie Thompkins, Bobby O. Williams, and Martin Woolley each had their death sentences commuted "to a Sentence Other Than Death for the Crime of Murder, So that the Maximum Sentence that may be Imposed is Natural Life Imprisonment Without the Possibility of Parole or Mandatory Supervised Relief [*sic*]."

In the 13 cases where Governor Ryan specified that natural life imprisonment without the possibility of parole or mandatory supervised release was to be the maximum sentence, the defendants were all awaiting resentencing. In four instances, those involving William Bracy, Roger Collins, Robert St. Pierre and Patrick Wright, resentencing had been ordered by federal court. In the other nine cases, those involving Ronald Alvine, Cortez Brown, Tony Damero, Tyron Fuller, Julius Kuntu, Eric Lee, Willie Thompkins, Bobby O. Williams and Martin Woolley, new sentencing hearings had been ordered by this court.

In the remaining 150 cases, including the case of Robert Morris, the defendant in the proceeding now before us, the death sentences were simply commuted to "natural life imprisonment without the possibility of parole or mandatory supervised release." At the time Governor Ryan granted those commutations, most of the affected death row inmates had exhausted their legal remedies. Only 53 still had cases pending in our court. Twenty-eight of those cases were in the briefing stage. In six additional cases, briefing had been stayed pending various developments, including remand for a fitness hearing and to permit filing of a corrected record.[1] Six other cases were on our rehearing docket. The remaining 14 cases, including defendant Morris' case, had been fully briefed and

---

[1]One of the six cases in which briefing had been stayed concerned the same defendant, Ralph Harris, involved in one of the 28 cases in which briefing remained underway.

argued and were on our advisement docket awaiting a decision.[2]

Shortly after Governor Ryan granted the commutations, our court entered an order, on its own motion, permitting counsel for parties in the capital cases still pending before us to "file with this court any motion deemed appropriate, including but not limited to the Supreme Court's continued jurisdiction." Based upon the responses we received and the circumstances of the individual cases, we entered orders retaining jurisdiction in 15 of the 20 cases on our advisement and rehearing dockets and transferring 3 of those 20 cases to the appellate court. Of the 34 cases where briefing was underway or had been stayed, we allowed the defendant to withdraw his appeal in one case, dismissed the appeals in three cases, retained jurisdiction in eight cases and transferred 22 cases to the appellate court.

---

[2]Of the 20 death row inmates whose cases remained on our advisement and rehearing dockets, only Cortez Brown received one of the commutations couched in terms of a maximum sentence. That was because among this group, he alone had been granted a new sentencing hearing. The other 19 defendants in this group, including defendant Morris, were among the 150 death row inmates whose sentences were commutated to "natural life imprisonment without the possibility of parole of mandatory supervised release."

After this court entered its order permitting counsel to file appropriate motions with respect to the still-pending capital cases, the Attorney General filed an original action for *mandamus.* See Ill. Const. 1970, art. VI, §4(a); 188 Ill. 2d R. 381. Through that action, the State sought to block implementation of Governor Ryan's commutation orders with respect to the group of death row inmates whose convictions remained intact but who were awaiting resentencing by the courts at the time their original sentences were commuted by the Governor. As the majority opinion points out, this court rejected that claim. With respect to this group of inmates, we held that the Governor's commutations were tantamount to partial pardons and that it was within the Governor's authority to grant such pardons, following conviction, to reduce the maximum sentence the defendants faced. *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457, 476-77 (2004).[3]

The Attorney General's *mandamus* action also challenged the Governor's authority to commute sentences of certain of the death row inmates, including the defendant in this case, who had not signed clemency applications or otherwise given consent for clemency to be requested on their behalf. Holding that the statutory procedure governing clemency applications (see 730 ILCS 5/3–3–13 (West 2002)) does not limit the Governor's constitutional authority to grant clemency (Ill. Const. 1970, art. V, §12), we concluded that the failure of

---

[3] For technical reasons not relevant here, our court also concluded that four of the so-called "unsentenced" defendants, Gregory Madej, Renaldo Hudson, William Bracey and Roger Collins, actually remained under sentence. Bracey and Collins moved to be dismissed from the *mandamus* action, and their motion was allowed. *People ex rel. Madigan v. Snyder*, 208 Ill.2d at 469-70, 477-78.

certain inmates to consent to the clemency petitions did not prevent the Governor from acting in their favor. *People ex rel. Madigan v. Snyder*, 208 Ill. 2d at 465-68.

Based upon the foregoing considerations, this court denied the Attorney General's petition for *mandamus*. We then vacated orders we had previously entered retaining jurisdiction over four of the cases on the rehearing docket. We also ordered an additional two cases on the advisement docket transferred to the appellate court.

In the period which followed, the various capital cases still pending proceeded toward final resolution. Richard Morris' case, over which we continued to retain jurisdiction, was ultimately decided by our court in March of 2004, approximately 14 months after Governor Ryan had commuted the death sentence imposed on Morris in the case we were reviewing. Our opinion reversed Morris' convictions and remanded the cause to the circuit court for a new trial on the grounds that he had been denied the effective assistance of counsel. *People v. Morris*, 209 Ill. 2d 137 (2004).

Had Morris not challenged the validity of his underlying convictions and simply been granted a new sentencing hearing, there is no question that Governor Ryan's commutation order would continue to control and that Morris would not be eligible for capital punishment. The maximum penalty that could be imposed is natural life imprisonment without the possibility of parole or mandatory supervised release, the punishment specified in the Governor's commutation order.

The problem posed by this case, and what distinguishes it from any of the other cases pending before us at the time Governor Ryan issued his pardons and commutation orders in 2003, is that Morris succeeded in obtaining more than a new sentencing hearing. Because his original trial counsel was so ineffective that "there was a breakdown of the adversarial process" (*People v. Morris*, 209 Ill. 2d at 188), Morris will receive a completely new trial at which he will be free to contest not only whether he is eligible for capital punishment, but whether he is even guilty of the murder for which he has been prosecuted.

˘15˘

In assessing the effect of Governor Ryan's 2003 commutation order on Morris' new trial, the majority interprets the Governor's order by relying on principles of statutory construction. Slip op. at 9. Clemency proceedings, however, are not legislative enactments. Although I have located no Illinois authority on point, courts in other jurisdictions have recognized that pardon and commutation decisions by the executive branch are a quasi-judicial function. See, *e.g.*, *Mellinger v. Idaho Department of Corrections*, 114 Idaho 494, 500, 757 P. 2d 1213, 1219 (1988); *State v. Bowman*, 145 N.C. 452, 454, 59 S.E. 74, 75 (1907); see also *Lucien v. Preiner*, 967 F.2d 1166, 1167 (7th Cir. 1992) (under Illinois law, consideration of clemency petitions is essentially a judicial function). Clemency determinations are therefore more akin to judicial decisions and should be construed according to the standards governing judgments, not statutes.

The general rule in Illinois is that judicial orders are to be construed like other written instruments. See *Fieldcrest Builders, Inc. v. Antonucci*, 311 Ill. App. 3d 597, 605 (1999). They should be interpreted reasonably and as a whole so as to give effect to the apparent intention of the entity which rendered them. See *Winter v. Winter*, 69 Ill. App. 3d 359, 363 (1978). They must also be construed with reference to the issues they were intended to decide. *Weigel v. O'Connor*, 57 Ill. App. 3d 1017, 1027 (1978). In determining the meaning of a judgment or decree, one must therefore examine the situation as it existed when the judgment or decree was rendered. See *Thomas v. Thomas*, 56 Ill. App. 3d 806, 808 (1978).

The clemency decisions made by Governor Ryan in this case and in the case of every other inmate on Illinois' death row in January of 2003 were made against the backdrop of a capital punishment system whose reliability had fallen into serious question. Although the groundwork was set for reintroduction of capital punishment as early as 1977, when the General Assembly enacted a revised death penalty statute following the United States Supreme Court's decision in *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976), Illinois did not resume executions until 1990, when Charles Walker was put to death after waiving further

challenges to his conviction and sentence. Even after that, executions did not become a regular feature of the judicial landscape until after John Wayne Gacy was put to death in 1994.

March of 1995 brought the state's first double execution when James Free and Hernando Williams were put to death on the same day. A succession of executions followed that year. By March of 1999, 12 men had been put to death.

As the pace of executions quickened and the size of Illinois' death row increased, flaws in this state's system of capital punishment began to surface. Defendants found guilty and sentenced to death were shown to be innocent of the crimes for which they were convicted. These were not isolated instances. By the end of 1998, just four years after regular executions had resumed, more defendants on death row were being exonerated than were being put to death.

The mounting evidence that Illinois' system of capital punishment was yielding unreliable results created dissension on our court (see *People v. Bull*, 185 Ill. 2d 179, 225-29 (1998) (Harrison, J., concurring in part and dissenting in part)) and controversy throughout the state. Four of the exonerated defendants received a $36 million settlement from the county in which they had been wrongly convicted. Investigative reports were published in the press. A national conference on wrongful convictions and the death penalty was convened in Chicago.

In February of 1999, Justice Harrison sent an open letter to Governor Ryan calling upon him to exercise the powers conferred upon him by article V, section 12, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. V, §12) to declare a moratorium on executions until the problems presented by the state's death penalty law could be addressed. The Governor declined to act. The following month, when Andrew Kokoraleis was scheduled to be executed, this court denied Kokoraleis' motion for a stay and summarily dismissed the appeal from the denial of his second postconviction petition, which included a claim of actual innocence based on newly discovered evidence. That action triggered a vigorous dissent from Justice Harrison, who wrote:

"The fatal defects I have noted in our capital punishment system are not theoretical. My prediction in *Bull* that an innocent person would inevitably be executed has very nearly come to pass. Last September, another capital defendant, Anthony Porter came within 48 hours of being executed. At the time, there was no real question as to his guilt. The delay was granted for reasons wholly unrelated to Porter's culpability. Subsequent developments showed, however, that he was, in fact, completely innocent. Significantly, those developments had nothing whatever to do with the efficacy of the courts. The courts were content to take Anthony Porter's life. He walks free today only because, as in so many other cases that preceded his, a dedicated group of volunteers decided to take up his cause.

In the wake of *Bull* and the Anthony Porter case, there has been nearly universal recognition by this state's legal community that our system of capital punishment is in dire need of change. Even those who have been ardent supporters of capital punishment have begun to concede the law's potentially horrific shortcomings. I do not know what the solution is. No one seems to. Committees have been convened and reforms have been proposed, but answers remain elusive. Perhaps there is no answer. I do know, however, that until we have a better understanding of where the system is failing and how, if at all, it can be remedied, the State of Illinois has no business continuing to send defendants to their deaths. It must be stopped from executing Kokoraleis and every other defendant sentenced under the existing capital punishment system. It is within the power of the governor to effectuate this result through the exercise of his constitutional authority to grant reprieves. Ill. Const. 1970, art. V, §12. If he is unwilling to exercise that authority, as he has shown himself to be in this case, it is incumbent upon our court to intercede.

Even if our present capital punishment laws were constitutional, I would still grant a stay of execution in the matter before us today. Our court routinely stays executions where, as here, a defendant seeks relief under the Post-Conviction Hearing Act (725 ILCS 5/122–1 *et seq.* (West 1996)). In fact, the clerk of this court has prepared a stock form for that purpose. There is no basis for deviating from our usual practice here. Kokoraleis' claim of actual innocence based on newly discovered evidence presents a constitutional question appropriate for post-conviction relief. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). Kokoraleis had no way of raising this matter in his initial petition, and putting him to death without affording him the opportunity to fully litigate the matter is fundamentally unfair.

\*\*\*

Where a post-conviction petitioner brings a facially valid appeal in accordance with the procedures established by our court, as Kokoraleis has done here, we have no authority under the law to summarily dismiss it. The General Assembly has expressly decreed that final judgments entered upon post-conviction petitions 'shall be reviewed in a manner pursuant to the rules of the Supreme Court.' 725 ILCS 5/122–7 (West 1996). Supreme Court Rule 651(d) (134 Ill. 2d R. 651(d)) provides that the procedures for appeals in post-conviction proceedings 'shall be in accordance with the rules governing criminal appeals, as near as may be.' Nothing in the rules governing criminal proceedings permits the summary dismissal of a facial valid, timely, and technically proper appeal. \*\*\*

\* \* \*

\*\*\* I do not wish to minimize the gravity of the offenses for which Kokoraleis has been convicted. The evidence presented at his trial depicted conduct that is almost beyond belief. I doubt that any rational person could read the accounts of [his victim's] shocking murder without feeling utter disgust and revulsion. The

depravity of the crime, however, cannot blind us to our constitutional obligations. No matter how despicable a defendant might be, we cannot forsake our allegiance to the rule of law." *People v. Kokoraleis*, 189 Ill. 2d 721, 722-24 (1999) (Harrison, J., dissenting).

Although Justice Harrison's protestations did not alter the outcome of Kokoraleis' case, Kokoraleis was the last person to be executed in Illinois. Within a month of his execution, this court acted to establish a special committee to study the trial and sentencing processes in capital cases. Approximately nine months later, Governor Ryan followed the course suggested by Justice Harrison and imposed a moratorium on executions in Illinois, declaring: "Until I can be sure that everyone sentenced to death in Illinois is truly guilty, until I can be sure with moral certainty that no innocent man or woman is facing a lethal injection, no one will meet that fate." See http://www.illinois.gov/PressReleases/ShowPress Release.cfm?SubjectID=3&RecNum=359.

Concerns over reliability of Illinois' system of capital punishment deepened as the number of exonerated defendants rose. To my knowledge, 18 men were ultimately determined to have been wrongly convicted and sentenced to death.[4] Although complaints were raised by some that the death penalty was not being applied fairly across racial and geographic lines, criticism of our system of capital punishment focused on the risks it posed of condemning to death individuals who were actually innocent.

When Governor Altgeld pardoned three of the Haymarket anarchists in 1893, he issued a lengthy pardoning statement to explain his reasons. J. Altgeld, Reasons for Pardoning the Haymarket Anarchists (1893). Governor Ryan published no similar document regarding the clemency orders he issued for Illinois' death row inmates 110 years later. As the majority

---

[4]They are, in alphabetical order, Joseph Burrows, Perry Cobb, Rolando Cruz, Gary Gauger, Alejandro Hernandez, Madison Hobley, Stanley Howard, Verneal Jimerson, Ronald Jones, Carl Lawson, Steven Manning, Leroy Orange, Aaron Patterson, Anthony Porter, Steven Smith, Gordon (Randy) Steidl, Darby Tillis, and Dennis Williams.

notes, however, Governor Ryan's decision to issue those orders was accompanied by a speech at Northwestern University Law School detailing the evolution of his views and the considerations that motivated his action. That speech, of which we have previously taken judicial notice (see *People ex rel. Madigan v. Snyder*, 208 Ill. 2d at 468), makes clear that Governor Ryan set aside the death sentences imposed on Richard Morris and the others on death row for two reasons: the first was his ongoing concern that the system under which they had been convicted was unjust and unreliable. "Our capital system is haunted by the demon of error," he wrote. "[E]rror in determining guilt, and error in determining who among the guilty deserves to die." See Governor George Ryan, Address at Northwestern University Law School (January 11, 2003).

The second was his belief that the other branches of government had failed to adequately address the system's flaws. His speech spoke of his frustration as he watched

> "as members of the Illinois General Assembly failed to pass even one substantive death penalty reform. Not one. They couldn't even agree on one. How much more evidence is needed before the General Assembly will take its responsibility in this area seriously?
>
> * * *
>
> One of the few disappointments of my legislative and executive career is that the General Assembly failed to work with me to reform our deeply flawed system. I don't know why legislators could not heed the rising voices of reform. I don't know how many more systemic flaws we needed to uncover before they could be spurred to action.
>
> * * *
>
> I cannot say it as eloquently as Justice Blackmun. The legislature couldn't reform it. Lawmakers won't repeal it. But I will not stand for it. I must act." See Governor George Ryan, Address at Northwestern University Law School (January 11, 2003).

The majority construes Governor Ryan's statements as evincing an intention to extend a blanket partial pardon from capital punishment to everyone on death row who was not pardoned or whose sentence was not commuted to a term of years. If that were so, however, his clemency orders would not have been limited to this group of defendants. They would also have encompassed Cecil Sutherland, who had been previously sentenced to death but had succeeded in obtaining not only a new sentencing hearing, but a new trial. Sutherland, who had won the right to a new trial prior to the Governor's actions, received no executive clemency. As a result, he remained subject to the death penalty on retrial and was, in fact, sentenced to death again.

Procedurally, the only difference between Richard Morris' case and Cecil Sutherland's is that at the time Governor Ryan made his clemency decisions, Sutherland had already been granted a new trial. Morris' case was still pending and the Governor did not know the outcome. Had the Governor been aware that Morris would likewise be granted a new trial, there is nothing to suggest that Morris would still have received clemency where Sutherland did not.

In my view, the events leading up the Governor's clemency orders, the statements made by the Governor in his January 2003 speech, and the different manner in which Cecil Sutherland's case was handled demonstrate that the Governor's actual intention was simply to insure that no one who had been convicted under the system he regarded as fundamentally flawed would be put to death based on that conviction. Achievement of that goal will not be compromised by permitting the State to seek the death penalty on Morris' retrial.

The risk of being put to death pursuant to a conviction obtained under the old system of capital punishment had already been a eliminated by the time Sutherland was retried and is not present now. That is so because the old system of capital punishment no longer exists. Extensive reforms have been instituted both by the General Assembly and by this court.

After becoming aware of the problems with this state's death penalty law, Governor Ryan appointed a Commission on Capital Punishment to determine what reforms, if any, would ensure that Illinois' capital punishment system is fair, just and accurate. The Commission's efforts yielded 85 separate recommendations dealing with all aspects of how death penalty cases are investigated, filed, tried, and reviewed.

In the wake of the Commission's report, the General Assembly enacted a number of new laws aimed at improving the state's system of capital punishment. That legislation includes Public Act 93–0517, mandating the electronic recording of confessions in homicide cases; Public Act 93–0655, which requires the decertification of police officers who commit perjury in the course of a homicide case; and Public Act 93–0605, which addresses a wide range of issues, including DNA testing, the reliability of jailhouse snitches, line up and photo spread procedures, postconviction proceedings to establish actual innocence, reduction of death eligibility factors and allowing our court to set aside a particular death sentence on review whenever we find that the sentence is not fundamentally just as applied in that case.

Independent of the efforts undertaken by the executive and legislative branches, our court initiated its own investigation into how capital trials could be improved. In April of 1999, nine months before Governor Ryan declared a moratorium on executions, this court appointed its own committee to study the trial and sentencing processes in capital proceedings. The Special Supreme Court Committee on Capital Cases issued its first set of findings and recommendations on October 28, 1999, followed by supplemental findings and recommendations in October of 2000 and a second set of supplemental findings and recommendations in January of 2001. As a result of the Special Committee's efforts, our court undertook one of the most comprehensive revisions of its rules in recent history, amending four existing rules and adding four entirely new rules.

Highlights of the rules revisions included:

      (1) creation of a capital litigation trial bar, establishing minimum standards of training and

experience for defense counsel and assistant prosecutors appearing in capital cases;

(2) provision for Capital Litigation Regional Seminars to give specialized training for all judges who may preside over death penalty cases as part of their designated duties;

(3) implementation of new requirements for the management and administration of death penalty cases, including imposition of time deadlines for the State to give notice of its intention to seek the death penalty, appointment of two properly certified members of the capital litigation trial bar to represent every indigent capital defendant, authorization for discovery depositions of witnesses, and requiring case management conferences;

(4) imposition of standardized requirements for disclosures concerning DNA evidence;

(5) extension of criminal discovery rules to sentencing hearings in capital cases; and

(6) revision of the Rules of Professional Conduct to specify that "the duty of a public prosecutor or other government lawyer is to seek justice, not merely to convict."

The new measures enacted by the General Assembly and by this court will be fully applicable to Richard Morris' case on retrial. Our experience with these new measures is admittedly limited, and we do not know yet whether they will be adequate to remedy all of the problems that precipitated the overhaul of our system of capital punishment. In my view, however, we have no reason to doubt that they will be sufficient to redress the problem that required us to set aside Morris' original conviction and which led the Governor to commute his original sentence.

As previously indicated, the fatal flaw in Morris' original trial was that he did not receive effective assistance of counsel. Ensuring the adequacy of representation is, however, one of the cornerstones of the recent capital punishment reforms. Under our new rules, no one who is not fully qualified and

experienced will be permitted to provide legal defense to Morris or anyone who is being prosecuted for a capital offense. The predicate for Morris' commutation having thus been addressed, we have no more reason to bar the State from seeking the death penalty when he is tried again than we would in any new capital case coming up for trial for the first time.

Morris has raised various subsidiary arguments regarding his future eligibility for the death penalty, but these are also without merit. Morris asserts that the State should be precluded from seeking a sentence of death because its conduct is motivated by vindictiveness. The circuit court specifically rejected this contention, however, and there is no basis in the record to question its conclusion.

There is likewise no basis for Morris' argument that subjecting him to the prospect of capital punishment on retrial contravenes his right to due process of law. Indeed, it strikes me as incongruous for Morris to suggest that the clemency order somehow invested him with due process protections where, as here, he did not petition for clemency himself and did not consent to having a clemency petition filed on his behalf.

Finally, I cannot accept Morris' claim that imposition of the death penalty again is precluded by statutory prohibitions against imposing a more severe sentence after the original sentence has been set aside on direct review or on collateral attack. See 730 ILCS 5/5–5–4(a) (West 2004). Capital punishment is not more serious than Morris' original sentence. It is the same. Moreover, the original sentence was not set aside on direct review or on collateral attack. It was overridden by an act of executive clemency.

For the foregoing reasons, I respectfully dissent. The circuit court erred in granting Morris' motion to bar the state from seeking the death penalty on retrial. Its order should therefore be reversed.