In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-3044

ROBERT SIMPSON,

*Petitioner-Appellant,*

*v.*

DEIRDRE BATTAGLIA, Warden,[1]

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 3885—**Matthew F. Kennelly**, *Judge.*

ARGUED FEBRUARY 10, 2006—DECIDED AUGUST 11, 2006

Before POSNER, RIPPLE, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Proceeding pro se, Robert Simpson
was convicted by an Illinois jury of first degree murder and
armed robbery and sentenced to death. Simpson's sentence
was later commuted to natural life imprisonment without
the possibility of parole by former Illinois Governor George
Ryan. After exhausting his appeals and collateral remedies
at the state level, Simpson filed a petition for habeas corpus
under 28 U.S.C. § 2254. The district court denied the

---

[1] Deirdre Battaglia has been substituted for the original respon-
dent, Kenneth R. Briley, pursuant to Federal Rule of Appellate
Procedure 43(c)(2).

petition on all the grounds Simpson alleged. On appeal Simpson primarily takes issue with his waiver of counsel and the performance of standby counsel. We affirm.

## I. HISTORY

There is no dispute as to the factual background, with each side citing to portions of the trial record and to Simpson's two appearances before the Illinois Supreme Court, *People v. Simpson*, 665 N.E.2d 1228 (Ill. 1996) (affirming Simpson's conviction and death sentence on direct appeal) ("*Simpson I*"), and *People v. Simpson*, 792 N.E.2d 265 (Ill. 2001) (upholding denial of collateral relief) ("*Simpson II*"). We garnered the facts accordingly.

### A. Robbery and Police Investigation

On May 10, 1992, Simpson and Carolyn LaGrone entered the Fairway Food grocery store in Glenwood, Illinois but soon left without making a purchase. A few minutes later they reentered the store. Simpson, carrying a gun concealed under a piece of newspaper, approached a service desk and told a store employee he was robbing the store. The employee responded, "You must be kidding." Simpson grabbed the employee by her smock and forced her to the ground. LaGrone approached the service area and held open a purse into which Simpson started putting money. Barbara Lindich, a store customer, walked up behind the woman and peered over LaGrone's shoulder. Simpson asked Lindich if she wanted to help and then shot her in the neck, a wound from which Lindich later died. Simpson and LaGrone left the store and got into a car in the parking lot in which Lurlarn Young was waiting. With Simpson at the wheel, the three drove off.

Shortly after arriving at the store, Greenwood police summoned Hayden Baldwin, a crime scene technician.

Baldwin obtained fingerprint impressions from various objects and found a spent casing inside the service office. Baldwin returned to the scene later that evening and recovered a bullet fragment employees had discovered in a door frame.

On May 25, the police arrested LaGrone, and she gave a statement detailing the offense and the roles of Young and Simpson. Later that day, the police arrested Young, who was Simpson's live-in girlfriend, as an accomplice to murder. At the time of her arrest, Young was driving a car matching a description of the getaway car.

While in custody, Young gave police two statements which were reduced to writing. Young also signed a form consenting to the search of the apartment she shared with Simpson. That evening, the police used Young's keys to make a warrantless entry into the apartment. The police found Simpson at the residence and arrested him. Early the next morning, Simpson was placed in a lineup and was identified by employees and customers as the man who they saw commit the robbery.

The police further questioned Young, and on May 26, she signed a second consent to search form. The police, accompanied by Young, returned to the apartment and searched a storage locker in the basement where they found a .380 caliber semiautomatic pistol, a .25 caliber semiautomatic pistol, ammunition, and other evidence linking Simpson to the crime.

Forensic analysis revealed one of the pistols recovered from Simpson's storage locker produced characteristics that matched the cartridge case and bullet fragment recovered from the scene. The fingerprints lifted at the store were LaGrone's.

*B.  Simpson's Waiver of Counsel*

Simpson's legal proceedings did not get off to a good start in the Circuit Court of Cook County. On June 17, 1992, Simpson, LaGrone, and Young were arraigned on charges of first degree murder, armed robbery, aggravated battery, and armed violence. Apparently while the court was making a record of the charges, Simpson attempted to confer with his co-defendants, leading to the following colloquy:

THE COURT:  Move that defendant away from these young ladies. Now Mr. Simpson, do you have the funds to hire your own lawyer?

SIMPSON:  We haven't had a chance to communicate. You think maybe we can get that opportunity?

THE COURT:  I don't know who you are talking about communicating with?

SIMPSON:  I'm talking about the three of us.

THE COURT:  You're not the spokesman for these young ladies.

SIMPSON:  I'm not saying I'm the spokesman. I asked you a simple question and you want to—

THE COURT:  I asked you a question.

SIMPSON:  I asked you could we have a conference.

THE COURT:  No, you cannot.

SIMPSON:  Well, then, fuck what you talking about. I talk to you like a man and you want to talk to me like you don't have good sense.

THE COURT:  I assume, Mr. Simpson, you think you have nothing to lose, but I can hold you in contempt of court.

| | |
|---|---|
| SIMPSON: | It's not what I think, motherfucka— |
| THE COURT: | I hold you in contempt and I sentence you to— |
| SIMPSON: | I don't care. Fuck you. |
| THE COURT: | —six months. |
| SIMPSON: | Sentence me to fifty fucking year. I don't care. |
| THE COURT: | Six months Cook County Department of Corrections. |
| SIMPSON: | Right. Fuck what you talking about. I talk to you like a man and you— |
| THE COURT: | I tell you what I think, Mr. Simpson— |
| SIMPSON: | You can't tell me a motherfucking thing, motherfucker. |
| THE COURT: | Remove Mr. Simpson from the courtroom. |

Simpson was removed from the courtroom and taken into custody.[2]

Simpson appeared in court soon thereafter three times, each time represented by a public defender. At these appearances, Simpson said he was ready for trial and voiced his desire to proceed pro se. The court informed Simpson that he would need to formally waive counsel and that the public defender would be appointed as standby counsel. At the third appearance, on August 12, Simpson told the court that he wanted to go to trial as soon as possible even if it

---

[2] At a later hearing, Simpson contritely apologized, explaining that he "was a little upset about a lot of little things," *i.e.*, his incarceration. The judge accepted Simpson's apology and told him that he did not take Simpson's remarks personally.

meant representing himself. When his appointed counsel, Frank Rago, said he needed a continuance to prepare for trial, Simpson petitioned the court to represent himself.

In response, the court said, "From looking at the charges in this case, it's a very complex case. I don't know if the State is going to be seeking the death penalty in this case, but they may be and there may be certain matters that you would not be able to handle if you do represent yourself in these matters. The law is that you will [be treated] just as if you were an attorney."

The court asked Simpson for an explicit waiver of his right to counsel. Simpson answered, "The problem is that too many people running up here doing too many different things and nobody is ever here that's supposed to be here each time. I want a jury trial and I'm ready for trial now." The court asked again for a waiver, and Simpson stated, "The last time I think we had talked and you said you were going to appoint him to act as co-counsel." The court asked a third time for a waiver, and Simpson said he wanted to go to trial, saying, "I'm going to represent myself if that's how the Court feels."

The court read the charges to Simpson and asked him if he understood, saying "Do you still wish to give up your right to a lawyer?" Simpson replied, "If that's what it takes to go to trial, yes." The court then read the penalties and asked Simpson if he understood, to which Simpson gave the same answer. The court then instructed Simpson that he had the right to a lawyer and that this right could not be taken away without his consent or approval. When the court asked Simpson if he understood, he said, "If I have a right to an attorney and the Court appoints an attorney, how come every time I step in here, somebody different steps up and doesn't know what's going on?" The court explained that Rago had lawyers assisting him, so that Simpson actually had three lawyers. The court also ex-

plained that the public defenders needed time to investigate in order to provide competent representation.

Should Simpson waive his right to an attorney, the court explained, it would appoint standby counsel whose role would be that of an observer. The court stated, "The reason why I do that is if there's some type of outburst or some type of thing that prevents me from proceeding to trial, because you have to be your own lawyer, then what may happen is if I have to remove you from the courtroom, then the stand-by counsel would then come in to represent you . . . . I would let you confer with that standby counsel if you wished to, but you would be representing yourself. That person would not be actively engaged at all in your trial. You would be representing yourself." Simpson replied, "Sounds fine."

The court clarified that if Simpson wanted to be represented by a lawyer, the lawyer was duty bound to do so effectively, which would require time to look at the case. The court then explained what functions a lawyer would perform and that if Simpson lacked the money, an attorney would be appointed for him. The court asked, "Do you have any questions about anything I have said to you?" Simpson replied, "No." The court then asked, "Knowing everything that I have said, do you still wish to give up your right to have a lawyer represent you in this case?" Simpson replied, "Yes."

The court then asked Simpson if he had graduated from high school and his level of education. Simpson replied, "I think I'm competent, Your Honor." The court repeated its question to ensure Simpson would not "have any problem researching the law in this area." Simpson responded that he was ready for trial. The court asked again, "And you want to represent yourself?" Simpson responded, "Yes. And I want a jury." The following colloquy ensued:

THE COURT:   I feel that you understand your rights under the law, under the possible penalties involved here. Do you understand what you're giving up?

SIMPSON:     Yes, sir.

THE COURT:   And I believe that's a free and voluntary decision on your part.

SIMPSON:     It is.

THE COURT:   Anybody force you to do this?

SIMPSON:     No.

THE COURT:   This is of your own free will?

SIMPSON:     Well, not my free will, but didn't nobody force me.

Simpson elaborated that he had a problem with one of the public defenders who appeared on his behalf at a previous hearing. The court told Simpson that the lawyer could be removed from the case if Simpson so desired, or that he could represent himself. Simpson said he would represent himself. The court appointed Rago to serve as standby counsel after Rago moved to withdraw from representing Simpson.

At two subsequent pretrial hearings the court asked Simpson if he wished to stick with his decision to waive counsel. The court explained to Simpson that while Simpson's waiver of counsel was not set in stone, he would not be able to use the retraction of waiver as a litigation strategy or delay tactic. The court said that at some point, Simpson's representation would have to be finalized. Simpson did not equivocate on his waiver.

*C. Simpson's Trial and Sentencing*

At trial, three employees present in the Fairway Food store identified Simpson as the man who was behind the service desk holding a gun. A customer in the store that day also identified Simpson as the man she saw passing in the lane next to her after she heard a male say, "This is a stick-up," and heard a loud "pop." Two of the employees and the customer identified one of the guns recovered from Simpson's storage locker as the weapon they saw him holding during the robbery.

Simpson called several witnesses who were present in the store at the time of the crime. Their versions of events differed from the prosecution witnesses' accounts, but did not contradict them. Simpson called co-defendant Young to the stand, but she invoked her right against self-incrimination and did not testify. Against the advice of the trial judge and at Simpson's request, the custodial statements of Young and LaGrone were published to the jury. Simpson did not testify. At the close of the evidence, the jury returned a verdict finding Simpson guilty of first degree murder and armed robbery. At the first stage of capital sentencing, the jury found Simpson to be eligible for the death penalty. Sentencing proceeded to the second stage, and Simpson continued to represent himself.

When it came time for Simpson to introduce mitigation evidence, he sought to call three judges to testify on his behalf. The court instructed Simpson's standby counsel to locate the judges and ask them if they knew of Simpson. None of the judges were able to remember Simpson. At Simpson's request, the trial judge contacted each of the judges on more than one occasion. Two judges stated their willingness to come to court but neither could remember Simpson. Simpson contacted one of the judges himself in order to refresh the judge's recollection. Simpson also requested and received various transcripts from witnesses.

The trial court repeatedly advised Simpson that he should present some other mitigation evidence to sway the jury not to impose death. Simpson declined, explaining that a death sentence would allow him to "bypass the Illinois Appellate Court" and go "directly to the Illinois Supreme Court." The trial court questioned Simpson's strategy of relying on post-trial motions or appeal and pointed out that if one member of the jury disagreed with the death sentence, it would not be imposed.

Simpson presented no mitigating evidence. The jury found no mitigating factors were present to preclude a death sentence. Rago, Simpson's standby counsel, did nothing on his own with regard to performing a mitigation investigation, nor did he examine the prosecution's aggravating evidence.

The court appointed counsel to represent Simpson on his post-trial motion. Simpson's counsel obtained Simpson's prison medical file which indicated he suffered from headaches, dizziness, fainting spells, and bad eyesight, and noted he had survived a gunshot wound to the head from a prior incident.[3] At the post-trial hearing, Simpson's counsel

---

[3] Specifically, Simpson's counsel obtained the affidavits of three "experts" which stated the following:

- Mr. Simpson's difficulty focusing, rapid speech, impulsive decision making, and apparent inability to fully comprehend the mitigation process are possible indicators that he suffers from Attention Deficit Disorder or Attention Deficit Disorder with Hyperactivity. This DSM-IV condition is a neurocognitive deficit that indicates neurological damage.

- I strongly suspect that Mr. Simpson has prefrontal cortex insufficiency. This leads to hyperactivity, inability to control rage and anger, and, most troublesome, poor judgment.

- The likelihood of organic brain syndrome is

(continued...)

argued Simpson was not competent to waive his right to counsel. The trial court denied Simpson's motion and sentenced him to death for murder and 30 years' imprisonment for armed robbery.

Simpson appealed directly to the Illinois Supreme Court which affirmed both his convictions and death sentence. *Simpson I*, 665 N.E.2d 1228. Then Simpson sought collateral relief in state court, the denial of which was affirmed by the Illinois Supreme Court. *Simpson II*, 792 N.E.2d 265. On May 31, 2002, Simpson filed an application and notice of intent to file a federal habeas corpus in United States District Court for the Northern District of Illinois. Simpson then filed a petition for executive clemency on August 19, 2002. On September 26, 2002, Simpson filed a petition for writ of habeas corpus. Governor Ryan commuted Simpson's death sentence to life imprisonment on January 10, 2003.

In light of the commutation, the district court inquired whether Simpson wished to proceed with his habeas petition despite the risk that the award of a new trial reopened the possibility of a death sentence.[4] Simpson

---

[3] (...continued)

> suggested . . . . There is clear evidence of agitation and this examiner agrees with others that there is at least an ADHD, though he favors a Bi-Polar Disorder . . . . Simpson was not mentally fit to proceed to trial or sentencing and is not presently mentally competent to be sentenced to death because he can't assist in his defense.

[4] The Illinois Supreme Court has recently held that former Governor Ryan's clemency orders would preclude a death sentence for defendants like Simpson even in the event of a retrial. *See People v. Morris*, 848 N.E.2d 1000, 219 Ill.2d 373 (Ill. 2006) (explaining that the clemency orders "relieve[d] defendant 'of the death penalty as a legal consequence of the offenses he had

(continued...)

elected to continue and filed an amended petition on June 27, 2003. On February 5, 2004, the district court issued an order denying relief on ten of Simpson's claims and directing supplemental briefing on Simpson's remaining claims, which were denied on June 28, 2004. Pursuant to the district court's certification, Simpson raises the following issues on appeal:

1.  Whether Simpson's waiver of his right to counsel was valid;

2.  Whether Simpson was entitled to standby counsel with a duty to investigate potential mitigation evidence for presentation at sentencing;

3.  Whether the trial court was obligated to appoint a mitigation expert in light of Simpson's alleged invalid waiver of counsel and purported ineffective standby counsel; and

4.  Whether evidence of Simpson's identity was the fruit of an illegal search because Lurlarn Young's consent was allegedly coerced and evidence of the coercion was suppressed.

## II. ANALYSIS

As with all habeas appeals, "we review a district court's findings of fact for clear error and its rulings on issues of law de novo." *Foster v. Schomig*, 223 F.3d 626, 634 n.4 (7th Cir. 2000) (citing *Warren v. Richland County Circuit Court*, 223 F.3d 454, 456-57 (7th Cir. 2000)); *see Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005). The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") requires a petitioner to "establish that the state

---

[4] (...continued)
committed' ").

court proceedings in his case resulted in a decision (1) 'that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006) (quoting 28 U.S.C. § 2254(d)); *see Williams v. Davis*, 301 F.3d 625, 631 (7th Cir. 2002). A state court's determination of a federal constitutional issue is unreasonable only if it is objectively unreasonable. *Williams v. Taylor*, 529 U.S. 362, 409 (2000). In other words, a state court's application of federal constitutional law will be upheld if it is "at least minimally consistent with the facts and circumstances of the case." *Rice v. McCann*, 339 F.3d 546, 549 (7th Cir. 2003) (quoting *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999)).

The parties do not dispute the facts; the only issues raised are questions of law. Simpson does himself no favors by not referring to the applicable state court decisions. "The relevant decision for purposes of our assessment is the decision of the last state court to rule on the merits of the petitioner's claim." *Charlton*, 439 F.3d at 374 (citing *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003)). Some of the issues Simpson raises were last reviewed by the Illinois Supreme Court in his direct appeal (*Simpson I*) and others on collateral review (*Simpson II*). Simpson merely argues what the trial court should have done, but that is not the proper basis of habeas review under the AEDPA.

### A. Simpson's Waiver of Counsel

Simpson argues that he was incompetent to stand trial and, therefore, incompetent to waive his right to counsel. And if he was competent, Simpson alternatively maintains his waiver of counsel was not made knowingly and voluntarily. According to Simpson, his inappropriate

behavior at his arraignment (and a similar blowup after he had been sentenced) called into question his competence. Had the trial court conducted a meaningful competence inquiry, Simpson argues, it would have learned of Simpson's medical and mental histories which were consistent with the affidavits later obtained in preparation for his post-trial motion.

The Supreme Court has held that for a criminal defendant to waive the right to counsel, he must be competent to waive the right and do so knowingly and voluntarily. *Godinez v. Moran*, 509 U.S. 389, 400-01 (1993). "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Id.* at 401 n.12 (citations omitted) (emphasis in original). A court is not required to make a competency determination in every case a defendant seeks to waive counsel; "[a]s in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence." *Id.* at 401 n.13 (citation omitted).

The state maintains that because Simpson did not argue that his outbursts were part of his competency claim to the Illinois Supreme Court, he has procedurally defaulted this claim. Alternatively, the state argues that Simpson did not make this argument to the district court, causing him to forfeit this claim.

To avoid procedural default, "[t]he petitioner must establish that he fully and fairly presented his claims to the state appellate courts, thus giving the state courts a meaningful opportunity to consider the substance of the claims that he later presents in his federal challenge." *Bintz v. Bertrand*, 403 F.3d 859, 863 (7th Cir. 2005) (citing *Harris*

*v. McAdory*, 334 F.3d 665, 668 (7th Cir. 2003)). "Fair presentment in turn requires the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). To do so requires a petitioner to "put forward operative facts and controlling legal principles." *Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004).

Although the state concedes Simpson has "fairly presented the legal principles controlling" his waiver of counsel claim, the state asserts nevertheless we cannot reach the merits of the issue. The state argues that Simpson's outbursts constitute operative facts which were not fairly presented to the Illinois Supreme Court or the district court to support his invalid waiver claim. It is agreed that Simpson did present the legal issue of the defective waiver of counsel. Given the abundance of additional factual support relied upon by the lower courts to deny this claim, as we discuss below, Simpson's outburst can hardly be considered to be "operative," so that its omission would cause procedural default of an entire issue.

Simpson points to identical language in both his petition for collateral relief on direct appeal to the Illinois Supreme Court and his petition for habeas corpus in the district court wherein he alleged in the factual background, "After launching into an obscenity-filled tirade against the trial court, [Simpson] was cited for contempt and removed from the courtroom." But Simpson did not argue specifically that his outburst evidenced his incompetence, and neither court made any mention of it. In any event, it would do Simpson no good if we were to give him the benefit of the doubt.

Although Simpson's outburst demonstrates ill will, bad manners, and certainly poor litigation strategy, it does not

exhibit Simpson's incapacity to waive his right to counsel. In some instances, the use of profanity can be compulsive so that the utterance could be considered to be involuntary, but Simpson does not fit into this category. Simpson's tirade actually proved him to be quite responsive to the judge. When the court said "you think you have nothing to lose," Simpson replied, "It's not what I think." After the court sentenced Simpson to six months' imprisonment, Simpson asked for fifty years. And when the court said "I tell you what I think," Simpson interrupted and said, "You can't tell me a motherfucking thing, motherfucker." A hothead Simpson may be, but legally incapacitated he was not.

The other incident of Simpson's misbehavior occurred at a post-trial hearing on November 30, 1993, six months after he was convicted and sentenced to death. The prosecutor informed the court of his suspicion that Simpson had surreptitiously filed a motion to withdraw Young's guilty plea on her behalf. Simpson then called the prosecutor a "liar," a "bitch," and a "motherfucker" before being escorted from the courtroom. As with the earlier blowup, we reject Simpson's claim that this is indicative of incompetence.[5]

For Simpson's argument that he did not knowingly waive counsel, relevant is the Illinois Supreme Court's review of the record in *Simpson I*. In *Simpson I*, the court noted Simpson "raises several arguments to support his contention he did not make a knowing and understanding waiver of counsel." 665 N.E.2d at 1237. The court referred to the Sixth Amendment's implicit right of self-representa-

---

[5] We note that during Simpson's post-conviction proceedings, the trial court did make a determination as to whether there was a bona fide issue with Simpson's competency. *Simpson II*, 792 N.E.2d at 276-77. Noting that Simpson's condition had not deteriorated, the trial court found no reason existed to order a competency exam, and the Illinois Supreme Court affirmed. *Id.*

tion afforded to criminal defendants, as recognized by *Faretta v. California*, 422 U.S. 806, 821 (1975). *Id.* The court then described, properly, the governing legal standards, citing *Godinez* for the waiver of counsel and *Johnson v. Zerbst*, 304 U.S. 458 (1938), for the waiver of a constitutional right, and its own consistent precedent.

The court proceeded to address Simpson's many arguments which asserted, in essence, that the trial court did not go far enough in probing the validity of his waiver before and during trial, and at sentencing. *Id.* at 1237-39. The court thoroughly discussed the trial record and agreed with the trial judge that Simpson "'knew what he was doing' when he waived his right to counsel and chose to represent himself." *Id.* at 1237. The court also concluded that there were no subsequent developments during trial or sentencing to require the court to appoint counsel. *Id.* at 1238-39. The court's analysis is supported by our own review of the record.

We conclude, therefore, that the district court's denial of Simpson's claims regarding his waiver of the right to counsel was appropriate.

### B. Simpson's Sentencing Issues

Simpson brings two claims related to his sentencing. First, Simpson argues that he received inadequate assistance of standby counsel for his failure to act during the mitigation phase of Simpson's death sentence proceedings. Second, in light of the alleged defective counsel and his own purported incompetence, Simpson maintains the court erred by failing to appoint a mitigation expert.

### 1. Justiciability

Before we address the substance of Simpson's sentencing claims, the state effectively raises three distinct justici-

ability issues relating to Governor Ryan's grant of clemency. The state argues there is significance to Simpson's less-severe resulting sentence, the executive nature of his confinement, and the affirmative act of his filing a petition for clemency. The state argues these circumstances have either rendered Simpson's sentencing claims moot or show that he has abandoned them.

With respect to mootness, this case is governed by the result we reached in *Madej v. Briley*, 371 F.3d 898 (7th Cir. 2004). In *Madej*, a federal district court issued a writ of habeas corpus (due to ineffective assistance of counsel at sentencing—an allegation Simpson makes here) ordering the state of Illinois to conduct another sentencing hearing for a death-row inmate. *Id.* at 899. The state took no action until Governor Ryan commuted the petitioner's sentence to natural life. *Id.* Rather than comply with the writ, the state sought vacatur, claiming the commutation rendered the re-sentencing hearing moot. *Id.* The district court disagreed because the petitioner's conviction for first degree murder subjected him to a statutory mandatory minimum sentence of 20 years' imprisonment, allowing him "to seek a term lower than the natural-life sentence that the Governor substituted for the death penalty." *Id.* Affirming, we noted, "A full remedy for the constitutional shortcoming at the original sentencing hearing entails allowing [the petitioner] to seek that lower sentence now." *Id.*

Simpson's circumstances are virtually identical to the petitioner's in *Madej*. Simpson's death sentence was commuted to natural life by the Governor, and his statutory minimum sentence is for a term of 20 years, *see* 720 ILCS 5/9-1(b)(6); 730 ILCS 5/5-8-1(a)(1)(a). Therefore it is possible for Simpson to obtain relief, and his sentencing claims are not moot.

The state argues Simpson's clemency petition caused him to abandon his state court sentencing remedies. Resolving

the issue requires two considerations: first, whether Simpson satisfied the AEDPA's exhaustion requirement, and if so, whether Simpson's subsequent petition for executive clemency effected a waiver of these issues.

Federal habeas relief is not available if the petitioner has not exhausted his state court remedies. *See* 28 U.S.C. § 2254 (b)(1)(A). "Failure to exhaust available state court remedies constitutes a procedural default." *Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001) (citing *Howard v. O'Sullivan*, 185 F.3d 721, 725 (7th Cir. 1999)). Following the standards of procedural default we previously explained, whether Simpson has exhausted his state remedies for his sentencing claims turns on whether he ever fairly presented the issues to the Illinois Supreme Court.

Simpson asserts two federal claims regarding his sentencing: ineffective assistance of counsel and the failure to appoint a mitigation expert. Although Simpson did not raise his defective counsel claim on direct appeal, he did include the issue in his post-conviction petition, and the Illinois Supreme Court rejected it on the merits. *See Simpson II*, 792 N.E.2d at 283-86. However, it is doubtful that Simpson fairly presented a distinct claim that the trial judge erred by denying him the services of a mitigation expert. But we need not dig too deep: This claim is predicated upon our concluding that Simpson received ineffective assistance of standby counsel, which, as we explain below, we will not do.

Next we consider the effect of Simpson's bid for clemency. Simpson's petition for clemency was filed on August 19, 2002, after his two trips to the Illinois Supreme Court, and so it had no bearing upon which issues were before the Illinois courts. Moreover, Simpson's clemency bid had no discernable substantive effect because Governor Ryan commuted death sentences whether or not commutation was sought. *See Madigan v. Snyder*, 804 N.E.2d 546, 554 (Ill. 2004) ("[I]t is apparent that [Governor Ryan] intended

to grant blanket clemency because he believed that Illinois' death penalty system was broken. Thus, in this instance, the failure of certain inmates to consent to their petitions was irrelevant to the Governor.").

The state argues the petition for clemency and its granting replaced the judicial remedy (death) with an executive remedy (natural life imprisonment) under Illinois law, putting the issue beyond our review. For this proposition, Illinois cites to *Johnson v. Murphy*, 100 N.E. 980, 981 (Ill. 1913). We disagree. First, *Johnson* merely states that the executive has discretion to carry out a commuted sentence within the confines of applicable criminal statutes. *Id*. More importantly, Illinois does not point to a *federal* standard in which executive clemency at the state level operates to limit the reach of *federal* habeas review. *Cf. Burris v. Parke*, 116 F.3d 256, 258-59 (7th Cir. 1997) (expressing principle that the manipulation of state procedural mechanisms cannot be used to insulate state decisions from collateral attack in federal court).

Therefore, after exhausting his state court remedies, Simpson's subsequent clemency bid did not undo what his two appearances before the Illinois Supreme Court accomplished, and we conclude it is proper to resolve Simpson's defective counsel claim on the habeas merits.

### 2. Standby Counsel

Simpson argues that the failure of standby counsel to assist in the mitigation phase of capital sentencing constitutes ineffective assistance of counsel. The state court decision relevant for discussion is *Simpson II*. 792 N.E.2d at 283-285.

In *Faretta v. California*, the Supreme Court recognized a criminal defendant's Sixth Amendment right to represent himself pro se (the "*Faretta* right"). 422 U.S. at 819-20. The

Court noted, "Of course, a State *may*—even over the objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Id.* at 834 n.46 (citation omitted) (emphasis added).

In *McKaskle v. Wiggins*, 465 U.S. 168 (1984), the Court elaborated on the interplay of the role of standby counsel and a criminal defendant's *Faretta* right of self representation. The Court noted the *Faretta* right serves two objectives: to preserve a defendant's autonomy and, occasionally, to present the best possible defense. *Id.* at 176-77. The Court stated that the ends of the *Faretta* right may be served without barring outright the participation of unsolicited standby counsel. *Id.* On the other hand, to give effect to the *Faretta* right, the Court established limits: "the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury," and "participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id.* at 178.

Simpson couches his argument in the wrong terms (beyond foregoing any discussion of the Illinois Supreme Court's decision in *Simpson II*). Rather than assert his is the case directly contravening Supreme Court precedent, he merely maintains that some level of involvement by standby counsel, both before the jury's presence and beyond it, is within the contemplation of the Supreme Court's precedent. Simpson ignores our limited standard of review under § 2254 and urges us to extend the Sixth Amendment right of effective assistance of counsel to include a right to standby counsel, with the duty in a death penalty case to reasonably investigate mitigating evidence. *See Homan v. Gilmore*, 126 F.3d 876, 885 (7th Cir. 1997) ("No such principle has been adopted to date by the Supreme Court,

so § 2254(d)(1) precludes its recognition for the first time on collateral review.").

The *Faretta* right and the appointment of standby counsel inherently conflict which, taking into account that hybrid representation is not required, *McKaskle*, 465 U.S. at 183, supports the conclusion that there is no right to standby counsel. Certainly there is no Supreme Court precedent clearly establishing such a right. *See United States v. Windsor*, 981 F.2d 943, 947 (7th Cir. 1992) ("This court knows of no constitutional right to effective assistance of standby counsel."). When standby counsel is appointed, the primary concern is that appointed counsel does too much, so as to abrogate the *Faretta* right to self-representation, not too little. *See McKaskle*, 465 U.S. at 177 ("[T]he objectives underlying the right to proceed pro se may be undermined by unsolicited and excessively intrusive participation by standby counsel."). Therefore, the inadequacy of standby counsel's performance, without the defendant's relinquishment of his *Faretta* right, cannot give rise to an ineffective assistance of counsel claim under the Sixth Amendment. *See Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982) (citations omitted) (holding no deprivation of effective assistance was possible where there was no constitutional right to counsel); *accord Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (citations omitted). Simpson does not provide, nor could we find, a Supreme Court case holding standby counsel in a capital case should be treated any differently.

With that understanding, we proceed to the Illinois Supreme Court's consideration of Simpson's claim. *Simpson II*, 792 N.E.2d at 283-86. The court cited its own precedent to state, consistent with the Supreme Court's rulings, that "[t]he right of self-representation does not carry with it a corresponding right to legal assistance; one choosing to represent himself must be prepared to do just that." *Id.* at 283 (citation omitted). The court then correctly relied upon

*McKaskle* to describe the duties of standby counsel. *Id*. Finally the court, again applying state law congruous with federal law, noted the trial court had broad discretion to appoint standby counsel and to delineate his role. *Id*. (citation omitted).

The Illinois court continued to address Simpson's arguments supporting his claim of ineffective assistance of standby counsel. The court applied the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984), and, in the context of Simpson's case, concluded that Simpson was "required to establish that the actions of standby counsel prevented [Simpson] from accomplishing something he otherwise intended to accomplish or would have been able to accomplish if standby counsel had not prevented him from doing so, either through unreasonable advice or direct action." *Id*. at 285. Because standby counsel's primary duty is not to interfere with a defendant's *Faretta* right of self-representation, the standard set by the Illinois court in no way amounts to an unreasonable application of clearly established federal law. The court found that Simpson had not explained in any way how standby counsel prevented him from introducing evidence in mitigation and concluded that Simpson's claim had "no merit." *Id*. at 286.

Our review of the record brings us to a conclusion consistent with the reasoning of the Illinois Supreme Court. The trial judge appointed standby counsel to allow the trial to continue should another outburst cause Simpson to be removed from the courtroom. In addition to normal standby duties, the trial court directed standby counsel to assist Simpson, who was incarcerated during all phases of the proceedings, in the discovery of items Simpson sought. During trial, Simpson was never removed from the courtroom, and so standby counsel was never required to take the reins of Simpson's defense. Moreover, Simpson does not argue that standby counsel did not follow the trial court's or

Simpson's instructions. In fact, Simpson concedes he never asked for standby counsel to conduct a mitigation investigation or to present mitigation evidence to the capital sentencing jury.

It was Simpson's own decision not to provide the jury with mitigation evidence. The goal of this strategy, for better or worse, was to obtain an avenue of appeal directly to the Illinois Supreme Court that a death sentence would bring. The deficiencies of which Simpson now complains were products of his self-representation and do not constitute defective assistance of counsel. *See McKaskle*, 465 U.S. at 177 n.8 ("[A] defendant who exercises his right to appear *pro se* 'cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel.'" (quoting *Faretta*, 422 U.S. at 834 n.46) (internal quotation omitted)). Moreover, standby counsel, under *Faretta*, was bound not to interfere with Simpson's pro se efforts. The Illinois Supreme Court was not unreasonable to summarize, "Here, [Simpson] seeks to avoid the consequences of his decision to represent himself during the second stage of the sentencing hearing." *Simpson II*, 792 N.E.2d at 285.

### 3. Appointment of a Mitigation Expert

Simpson argues, given the ineffective assistance of standby counsel and his own incompetence, it was error for the trial court not to appoint a mitigation expert. However, as previously noted, this claim by its own terms presupposes our finding in Simpson's favor on the two previous questions on appeal. Because we answered them in the negative, we need not consider whether Simpson exhausted this claim in the state courts or, for that matter, the merits of this claim.

*C. The Court's Evidentiary Rulings*

Finally, Simpson alleges police coerced his co-defendant, Lularn Young, into consenting to the first search of her (and Simpson's) apartment by denying her access to diabetic supplies until she signed the consent to search form. Simpson contends that the prosecution withheld evidence of the coercion, in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Simpson claims that Young's consent allowed police to conduct an illegal search of Simpson's home, the fruits of which include: all the evidence arising from the initial search of Simpson's apartment, Simpson's warrantless arrest, the lineup identification of Simpson, and the testimony of witnesses who observed the lineup.

The district court found Simpson objected to the search in state court but did not argue Young's consent was coerced. Simpson admits he defaulted this claim by not raising it in state court but maintains he did not learn of the coercion until 2002, when his attorney interviewed Young in connection with his habeas petition. The district court determined Simpson had sufficiently shown that the state's alleged concealment of the coercion was the cause of the default.

However, the district court found that Simpson was not prejudiced by the state's alleged withholding of evidence because the state otherwise had presented ample evidence to support a conviction. The court pointed to evidence of Simpson's guilt which he did not contest to be fruits of an illegal search, such as LaGrone's testimony that she committed the robbery with Simpson and that Simpson shot the murder victim; forensic evidence linking the spent cartridge and bullet fragment recovered from the scene to a gun found in the storage locker in Simpson's basement; and the custodial statements of LaGrone and Young implicating Simpson.

The court found that the prejudice required to prevail on Simpson's *Brady* claim was merged with the prejudice he

needed to show to excuse his procedural default. The court concluded Simpson had not shown why his procedural default should be excused or, alternatively, that the withheld evidence cleared *Brady*'s materiality threshold.

There are a number of reasons to affirm the district court's denial of Simpson's *Brady* claim. Suffice it to say, there is no clear error with the district court's determination that Simpson was not prejudiced; the district court appropriately found ample evidence existed upon which a jury could convict. The court's denial of Simpson's *Brady* claim was correct.

## III. CONCLUSION

For the reasons set forth above, the district court's denial of Simpson's § 2254 petition is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*